In re Karen MAY.

**M. Randy Rice, Trustee, Plaintiff,**

v.

**First Arkansas Valley
Bank, Defendant.**

and

**M. Randy Rice, Trustee, Plaintiff,**

v.

**Regions Bank of Russellville,
Defendant.**

**Bankruptcy No. 4:02–bk–14785 E.
Adversary Nos. 4:02–ap–
1290, 4:02–ap–1291.**

United States Bankruptcy Court,
E.D. Arkansas,
Little Rock Division.

May 10, 2004.

M. Randy Rice, Little Rock, AR, Plaintiff–Chapter 7 Trustee.

Marian M. McMullan, Little Rock, AR, for Defendants Regions Bank and First Arkansas.

James V. Coutts, Russellville, AR, for Defendant Regions Bank.

## *MEMORANDUM OPINION*

AUDREY R. EVANS, Chief Judge.

Now before the Court are the Complaint to Avoid Preferential Transfer and the Complaint to Avoid Preferential Transfers, to Determine Validity and Extent of Liens and to Avoid Liens, filed by Plaintiff–Chapter 7 Trustee M. Randy Rice ("**Trustee**"), naming First Arkansas Valley Bank ("**First Arkansas**") and Regions Bank of Russellville ("**Regions**") as Defendants. The above-captioned adversary proceedings were consolidated for trial purposes only in an Order entered on May 27, 2003, and trial was held on these Complaints on February 3, 2004. Marian McMullan appeared on behalf of Regions and First Arkansas, and James Coutts appeared solely on behalf of Regions. Trustee appeared on his own behalf. Following the trial, all parties submitted post-trial briefs. The last of these briefs was filed with the Court on March 5, 2004.

Upon consideration of the pleadings filed, oral argument and evidence presented at trial, and the applicable law, the Court makes the following findings of fact and conclusions of law in accordance with Rule 7052.[1] This is a core proceeding

---

1. All references to rules in this order refer to the Federal Rules of Bankruptcy Procedure

pursuant to 28 U.S.C. § 157(b)(2)(K), and the Court has jurisdiction to enter a final judgment in these matters.

The Court finds, under these facts, that the sequential exercise of Trustee's powers under 11 U.S.C. §§ 547 and 544 permits the avoidance of Defendants' interests in the properties at issue in these adversary proceedings. The cumulative "strong-arm" powers as exercised by Trustee are explained in detail below.

### FACTS

These cases center around two parcels of land, both located in Pope County, Arkansas. Karen May, the debtor in this bankruptcy case ("**Debtor**"), lists these properties in her bankruptcy schedules as part of the bankruptcy estate.[2] The parties, both in their submissions and at trial, referred to these tracts of land as "the Ruth Lane Property"[3] and "the Lakeridge Property," and the Court will do likewise throughout this Opinion. The parties do not dispute that the documents as listed in the charts below were, in fact, filed. When those documents were filed is also not contested. The intent behind a number of these transactions and the effect of those transactions, however, are hotly contested. The Court heard testimony on these matters from Debtor, Debtor's adult children, Robyn and Bradley Shoptaw ("**the Shoptaws**"), Blake Tarpley (Senior Vice President, Commercial Lending, Regions), and Roy Reaves, (Chief Executive Officer, First Arkansas).

The complex history surrounding these properties began in 1996 and 1997, when the then-owners of the Ruth Lane Property-ty and the Lakeridge Property transferred their interests via warranty deeds to Piney Bay Development, Inc. ("**Piney Bay**"), a land development corporation wholly-owned by Debtor as sole shareholder. To understand the events that followed these initial transfers to Piney Bay, a detailed recitation of events in the chain of title for each property follows.

### I. The Lakeridge Property

In 1996, Jerry and Bridgett Parker transferred the Lakeridge Property to Debtor's corporation, Piney Bay. Debtor was also president and sole shareholder of Russellville Title and Closing, Inc. ("**RTC**"), a title and closing company. In May of 2000, RTC sought a loan from Regions secured by the Lakeridge Property. RTC was hired to perform the title work on the Lakeridge Property. The title insurance commitment, issued on May 17, 2000, in favor of Regions by RTC as authorized agent, correctly indicated that Piney Bay, not RTC, was the fee simple owner of this property. The title insurance commitment also stated that a mortgage/deed of trust executed by Piney Bay in favor of Regions was needed before title insurance would be issued. No such deed was executed and no title insurance policy was ever issued. Despite the fact that RTC had no interest in this property and that no title insurance policy had been issued, on May 23, 2000, RTC, through Debtor, executed a mortgage of all of its interest in the Lakeridge Property in favor of Regions. The mortgage was recorded on June 7, 2000.[4] The mortgage secured a

---

unless otherwise indicated.

2. The parties did not contest the fact that these properties fall within Debtor's bankruptcy estate.

3. This property is also referred to as "Maple Springs Road." *See In re May*, No. 4:02–bk–14785 E, 2002 WL 32114562, at *1 (Bankr. E.D.Ark. July 18, 2002).

4. The terms "filed" and "recorded" are used interchangeably throughout this Order.

loan from Regions to RTC in the principal amount of $169,730.09. Debtor signed the mortgage and note as President of RTC. Of this sum, $20,000 was paid directly to RTC, while the remainder was used to refinance a loan from another bank. In May 2001, the outstanding balance of $162,961.80 was refinanced with a new maturity date of May 19, 2003. This entire amount was paid to Regions to renew the prior loan. This renewal loan continued to be secured by the mortgage on the Lakeridge Property, and that mortgage was modified to reflect the extended maturity date.

On March 19, 2002, following initiation of foreclosure proceedings, Regions filed a lis pendens on the Lakeridge Property. Soon after the filing of the lis pendens, on March 29, 2002, the Shoptaws executed quitclaim deeds transferring all their interest in the Lakeridge Property to Debtor, even though the Shoptaws never owned any interest in that property. Debtor filed the instant bankruptcy petition on April 30, 2002. Finally on December 12, 2002, Piney Bay executed a quitclaim deed transferring all of its interest in the Lakeridge Property to Debtor's bankruptcy estate; that quitclaim deed was filed on December 20, 2002. For clarity, these transactions and filings are summarized below in chronological order. The dates indicated are the recording dates of the referenced documents:

| Document Type | Interest Transferred | From | To | Date |
|---|---|---|---|---|
| 1. Warranty Deed | all interest in realty | Jerry & Bridgett Parker | Piney Bay | 06/24/96 |
| 2. Mortgage | all interest in realty | RTC | Regions | 06/07/00 |
| 3. Lis Pendens, filed by Regions | N/A | N/A | N/A | 03/19/02 |
| 4. Quitclaim Deeds | all interest in realty | The Shoptaws | Debtor | 03/29/02 |
| 5. Bankruptcy petition filed by Debtor | N/A | N/A | N/A | 04/30/02 |
| 6. Quitclaim Deed | all interest in realty | Piney Bay | Debtor's Bankruptcy Estate | 12/20/02 |

As is more clearly evident from the chart above, at the time RTC gave a mortgage to Regions, RTC was not the owner of the property; Piney Bay was still listed as record owner. Moreover, at the time the Shoptaws deeded this property to Debtor, they were not owners of the property.

Regarding the Lakeridge Property, Debtor stated, in sum, that although Piney Bay was the record owner when RTC granted a mortgage on that property and there were no records indicating RTC was the actual owner, Debtor felt that her "personal guarantee" as sole owner of both RTC and Piney Bay was sufficient to permit the mortgage of that property to Regions. Mr. Tarpley stated that he considered the fact that Piney Bay never transferred ownership of that property to

RTC to be an error, since Debtor represented that she would quitclaim that property to RTC.

On cross-examination, Mr. Tarpley stated that Regions never received a title insurance policy and that Regions was essentially relying on Debtor, in light of their past positive business dealings and her experience, to take the necessary steps to safeguard Regions' interest in the property at issue. He stated that Regions was aware at the time it made the loan on the Lakeridge Property that Piney Bay was listed as owner, not RTC. Also, Mr. Tarpley stated that this was the only instance that he knew of where Regions had loaned money without first determining whether the borrower actually owned the property offered as collateral.

## II. The Ruth Lane Property

In 1997, Helen Nelson transferred by warranty deed surface rights only in the Ruth Lane Property to Piney Bay. On February 2, 2000, Piney Bay transferred by warranty deed surface rights only in this property to the Shoptaws. On March 9, 2001, Debtor, individually, and not on behalf of a corporation, executed a mortgage of all her interest in the Ruth Lane Property in favor of Regions. This mortgage was recorded on March 14, 2001. The mortgage secured a loan from Regions to Debtor in the principal amount of $50,099.50. RTC performed the title work on this mortgage, and the title insurance commitment, issued March 8, 2001, in favor of Regions by RTC as an authorized agent, indicated that Debtor owned the fee simple interest in the Ruth Lane Property. However, Debtor was not the fee simple record owner of the property; the Shoptaws were the record owners of the sur-face rights, and Helen Nelson was the record owner of any other rights in the property. On March 16, 2001, the Shoptaws transferred by quitclaim deed mineral rights only to Debtor. Debtor next executed a mortgage on this property in favor of Mr. Ron Hasty, Sr., which was recorded on August 31, 2001. Debtor then executed a mortgage on this property in favor of First Arkansas, securing a loan in the principal amount of $11,346.47. This First Arkansas mortgage was recorded on November 7, 2001. RTC performed the title work on this mortgage as well, and the title insurance commitment, issued on October 15, 2001, in favor of First Arkansas by RTC as an authorized agent, again indicated that Debtor was the fee simple owner of the Ruth Lane Property; however, as stated above, this was not the case. Mr. Hasty subsequently subordinated his interest in this property to First Arkansas, and this Subordination of Lien was recorded on the same date as the mortgage, November 7, 2001. Although there were commitments for title insurance, no title insurance policies were ever issued.

Following initiation of foreclosure proceedings, Regions filed a lis pendens on March 11, 2002. On March 28, 2002, the Shoptaws conveyed all of their interest in the Ruth Lane Property via quitclaim deeds to Debtor; these instruments were recorded on March 29, 2002. First Arkansas also filed a lis pendens on April 4, 2002, following commencement of foreclosure proceedings, and as stated above, Debtor filed the instant bankruptcy case on April 30, 2002. For clarity, these transactions and filings are summarized below in chronological order. The dates indicated are the recording dates of the referenced documents:

| Document Type | Interest Transferred | From | To | Date |
|---|---|---|---|---|
| 1. Warranty Deed | surface rights only | Helen Nelson | Piney Bay | 08/15/97 |
| 2. Warranty Deed | surface rights only | Piney Bay | The Shoptaws | 02/07/00 |
| 3. Mortgage | all interest in realty | Debtor, individually | Regions | 03/14/01 |
| 4. Quitclaim Deed | mineral rights only | The Shoptaws | Debtor | 03/16/01 |
| 5. Mortgage | all interest in realty | Debtor, individually | Ron Hasty, Sr. | 08/23/01 |
| 6. Subordination of Lien | all interest in realty | Ron Hasty, Sr. | First Arkansas | 11/07/01 |
| 7. Mortgage | all interest in realty | Debtor, individually | First Arkansas | 11/07/01 |
| 8 Lis pendens, filed by Regions | N/A | N/A | N/A | 03/11/02 |
| 9. Quitclaim Deeds | all interest in realty | The Shoptaws | Debtor | 03/29/02 |
| 10. Lis pendens, filed by First Arkansas | N/A | N/A | N/A | 04/04/02 |
| 11. Bankruptcy petition filed by Debtor | N/A | N/A | N/A | 04/30/02 |

As can be seen from the Ruth Lane chart, Piney Bay only obtained surface rights in this property from Helen Nelson. When the Shoptaws obtained an interest from Piney Bay in February of 2000, it could only have been in the surface rights, since that is the only interest that Piney Bay had which it was capable of conveying. When the Shoptaws purported to convey mineral rights in this property to Debtor in March of 2001, they did not have those rights to convey, since the mineral rights remained (and apparently still remain) vested in Helen Nelson. Therefore, when Debtor executed mortgages on the Ruth Lane Property in favor of Regions, First Arkansas, and Mr. Hasty, she was not the record owner; Helen Nelson was the record owner of the mineral rights, and the Shoptaws were the owners of the surface rights. Even when the Shoptaws transferred any remaining interest via quitclaim deeds to Debtor on March 29, 2002, the only interests they had in the Ruth Lane Property at that time were the surface rights, since Piney Bay never owned an interest in the mineral rights.

In sum, Debtor and the Shoptaws testified that although Piney Bay transferred only the surface rights in the Ruth Lane Property to the Shoptaws and although the March 2001 quitclaim deed from Shoptaws purported to transfer mineral rights to Debtor, the overall intent of those transactions was to effect full transfers of all rights in the Ruth Lane Property, not simply portions of their interests, despite what was indicated on the faces of the relevant documents. Debtor and the Shoptaws also testified that the quitclaim

deeds on Ruth Lane, filed on March 29, 2002, were essentially for the purposes of clearing any confusion regarding title to this property and to remedy their previous mistakes in conveyance. Ms. Robyn Shoptaw testified that she believed, based on conversations with an attorney representing First Arkansas, if she did not sign this second quitclaim deed, criminal charges might have been brought against Debtor. Mr. Bradley Shoptaw also stated that he was threatened with legal action if he did not sign the second quitclaim deed on the Ruth Lane Property. Although she never personally held title to the Ruth Lane Property, Debtor testified that she paid for improvements on the Ruth Lane Property, including a fence and barn, and that she paid the utilities and maintained horses on that property.

Mr. Tarpley testified that it was his understanding that Regions had a first mortgage on the Ruth Lane Property, relying on Debtor's representation that she individually held legal title to that property and on a title insurance commitment from RTC. After Debtor defaulted on the loan, Regions initiated foreclosure proceedings on the Ruth Lane Property. Regions learned of the title problems on the Ruth Lane Property following the filing of the lis pendens. However, Mr. Tarpley testified that even then he did not have any concerns that Regions did not have a first mortgage, in light of past dealings with Debtor. Moreover, Mr. Tarpley indicated that at the time, he was confident any problems were due to simple mistakes in paperwork.

Mr. Reaves was the final witness to testify on these matters. He stated at trial that in March of 2002, First Arkansas learned that there was a cloud on the title of the Ruth Lane Property. This cloud was due to the fact that the Ruth Lane Property had not been properly trans-ferred to Debtor. Mr. Reaves testified that, in order to remedy the situation, First Arkansas' attorney was to obtain a deed properly conveying the property from the Shoptaws to Debtor. He also testified that he relied on Debtor's representations in the loan documents and the title commitment that she had good title to the Ruth Lane Property. In addition, Mr. Reaves examined an exhibit listing conveyances of the Ruth Lane Property and stated that the mortgage to Regions followed soon after by a deed conveying mineral rights would raise a "red flag" and would have been cause for question and concern, if he had been doing the title search.

On cross examination, Mr. Reaves stated that First Arkansas used RTC as the title insurance company, even though another company could have been used, because to do otherwise would have been a "slap in the face" to Debtor and would have suggested that she was "not competent or [did not have the] character" to properly obtain title insurance.

### LAW AND DISCUSSION

■ Trustee argues that the quitclaim deeds from the Shoptaws to Debtor, as well as the lis pendens filings, constitute preferential transfers and that such transfers should be avoided and set aside, thus rendering liens, if any, held by Defendants on the properties unperfected and subject to avoidance under Trustee's "strong-arm" powers. Defendants argue, in essence, that the Court should invoke its equitable powers, under the theories of reformation and constructive and resulting trusts, to reform these instruments to reflect the alleged true intent of the parties, so as to render their liens valid and not subject to avoidance by Trustee. They also argue that the filings of record on these properties, including lis pendens filings, preclude Trustee from attaining bona fide purchaser

status under state law. At trial, Defendants, ultimately seeking equitable relief, focused primarily on common law defenses, such as alleged mistakes in these transactions and the intentions of the parties in undertaking these transactions. However, it is equally if not more important to place those facts which are before the Court in the statutory framework of the Bankruptcy Code and Arkansas law, so as to determine what, if any, effect the Defendants' and Debtor's intentions and alleged mistakes may have on lien avoidance and preferences.

## I. Preferential Transfers

■ "The Bankruptcy Code allows the trustee to avoid (set aside) pre-bankruptcy transfers of the debtor's property that would result in preferential treatment of favored creditors." *Lindquist v. Dorholt (In re Dorholt, Inc.)*, 224 F.3d 871, 872–73 (8th Cir.2000). Under 11 U.S.C. § 547(b),

> any prepetition transfer is preferential and avoidable if five elements ... are present. The transfer must be made 1) to or for the benefit of a creditor; 2) for or on account of antecedent debt; 3) while the debtor was insolvent; 4) to a noninsider on or within ninety days of the filing of the bankruptcy case; and, such transfer must 5) result in the creditor receiving more than the creditor would have received in a hypothetical liquidation in a Chapter 7 case.

*In re Wade*, 219 B.R. 815, 818–19 (8th Cir. BAP 1998). Trustee has the burden of proving these elements. 11 U.S.C. § 547(g).

### A. Transfers to or for Defendants' Benefit within 90 days of Bankruptcy Filing

■ The threshold question is whether the lis pendens filings and the quitclaim deeds from the Shoptaws to Debtor on the properties at issue constitute "transfers" for preference purposes. The Code defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54).

The quitclaim deeds from the Shoptaws to Debtor on the Lakeridge Property, recorded on March 29, 2002, do not constitute an effective transfer since the Shoptaws had no interest in that property to convey at that time. *See Opaline King Hill v. Gilliam*, 682 S.W.2d 737, 739, 284 Ark. 383, 387 (1985) (citation omitted) ("A quit-claim deed conveys the interest of the grantor in the property described in the deed."). However, the Shoptaw quitclaim deeds recorded on March 29, 2002, conveying their interest in the Ruth Lane Property to Debtor, clearly meet the Code's definition of transfer, since the Shoptaws held title to the surface rights at that time.

The recording of lis pendens on both properties at issue constitute a transfer of some interest in property, since at a minimum, such recording operates to encumber property and detract from the rights of the property owner. Finding that the recording of lis pendens constitutes a transfer of an interest for preference purposes under 11 U.S.C. § 547 is in accord with prior case law. *See Dupwe v. Worthen Nat'l Bank (In re Rising Fast Rentals, Inc.)*, 162 B.R. 203, 204 (Bankr.E.D.Ark. 1993) (citing Arkansas lis pendens statute, Ark.Code Ann. § 16–59–101 *et seq.*) ("[T]he recording of the notice of lis pendens is itself a 'transfer' within the meaning of section 547, which transfer occurred when the notice was recorded."). The transfers (lis pendens filings on both properties and Shoptaw quitclaim deeds on

Ruth Lane) were effective when recorded. *See id.* All of these transfers occurred within 90 days of Debtor's bankruptcy filing. Since the Court finds these transfers were within this 90 day period, the question of "insider" status is not relevant and moreover was not raised at trial.

In these cases, the lis pendens were recorded by Defendants and the quitclaim deeds were executed by the Shoptaws and recorded at Defendants' request under perceived threat of legal action, and at least as to First Arkansas, under perceived threat of criminal prosecution of Debtor, the Shoptaws' mother. It is therefore clear that these transfers were for Defendants' benefit, since such transfers were attempts to protect the Defendants' interests, if any, in the properties by remedying alleged mistakes in past conveyances.

### B. For Antecedent Debt

■ "Debt," as defined in the Bankruptcy Code, "means liability on a claim." 11 U.S.C. § 101(12). A debt is "antecedent" for preference purposes if the debt "was incurred before the allegedly preferential transfer." *In re Armstrong*, 291 F.3d 517, 522 (8th Cir.2002) (citations omitted). "A debt is incurred on the date upon which the debtor first becomes legally bound to pay." *Id.* (citations and internal quotes omitted). The evidence before the Court demonstrates that the debts to First Arkansas and Regions were incurred prior to the recording of the lis pendens and the Shoptaw quitclaim deeds to Debtor and that Debtor was bound to pay these debts prior to these transfers. These transfers were undertaken due to Debtor's prior obligations to pay First Arkansas and Regions, in an attempt to protect the Defendants' interests, if any, in the properties.

### C. While Debtor Was Insolvent

■ The Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," exclusive of exempt property or property transferred to delay or defraud creditors. 11 U.S.C. § 101(32)(A). For purposes of determining preferences, the Code provides for a presumption of insolvency "on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). "Though a debtor is presumed insolvent during the preference period ... if the creditor produces evidence of solvency, the debtor has the ultimate burden of proof." *Jones Truck Lines, Inc. v. Full Service Leasing Corp.*, 83 F.3d 253, 258 (8th Cir.1996) (citation omitted).

The evidence admitted at trial, including Debtor's petition and schedules, demonstrate that Debtor was insolvent at the time of the lis pendens filings and the recording of the Shoptaw quitclaim deeds. Moreover, no evidence rebutting the presumption of insolvency was produced.

### D. Transfers Resulted in Defendants Receiving More Than They Would Have in Hypothetical Chapter 7 Liquidation

■ Under 11 U.S.C. § 547(b)(5), "the transfer must enhance the creditor's position over that which it would have enjoyed if the subject transfer had not been made and the creditor received distribution on its claim under the provisions of the Bankruptcy Code." *In re Flanagan*, 293 B.R. 102, 107 (Bankr.D.Conn.2003). The Court evaluates the lis pendens filings on the Ruth Lane and Lakeridge Properties and the March 2002 Shoptaw quitclaim deeds on the Ruth Lane Property in light of the chain of title as detailed in the charts above. It is evident that, but for these transfers, Defendants would have had no colorable legal interests in these

properties. The Court therefore finds, for preference purposes only, that these transfers enhanced Defendants' positions over that which they would have enjoyed had these transfers not been made. *See Rising Fast Rentals, Inc.,* 162 B.R. at 204 ("The Court concludes that [lis pendens filing], to the extent it perfected or created any additional rights in the subject property, is a preference.").

### E. Conclusion

Based on the foregoing, the Court finds that Trustee has met his burden in demonstrating that the Shoptaw quitclaim deeds on the Ruth Lane Property, filed on March 29, 2002, and the lis pendens filed by Defendants on both the Ruth Lane and Lakeridge Properties constitute preferential transfers under 11 U.S.C. § 547(b) and are avoided. The Court's analysis under the trustee's "strong-arm" provision will therefore focus on the status of Defendants' previously filed mortgages, in light of these avoided transfers.

### II. "Strong–Arm" Provision

■■■■ The applicable avoidance provision is 11 U.S.C. § 544(a)(3) when real property is at issue. *In re Marlar,* 252 B.R. 743, 752 (8th Cir. BAP 2000), *judgment aff'd,* 267 F.3d 749 (8th Cir.2001) (citation omitted). "Section 544(a)(3) allows the avoidance of a transfer of real property that is not perfected and enforceable against a bona fide purchaser at the time the bankruptcy petition is filed." *Id.* (citation omitted). Whether the trustee can attain this status of hypothetical bona fide purchaser is determined according to

state law. *Id.* (citations omitted). "The trustee's rights and powers under section 544(a) are determined as of the date the bankruptcy case was commenced." *Id.* (citation omitted).

■■■ Under Arkansas law, "[r]ecordation of an instrument which affects title to real property is constructive notice of that interest to all persons from the time the instrument is filed." *Massey v. Wynne,* 302 Ark. 589, 591, 791 S.W.2d 368, 369 (1990) (citing Ark.Code Ann. § 14–15–404(a)). "If an instrument affecting title to real property is not recorded in the clerk's office of the county where the real estate is situated, then it shall not be valid against a subsequent purchaser of the real estate unless that purchaser had actual notice of the prior interest." *Id.* (citing Ark.Code Ann. § 14–15–404(b)). "A subsequent purchaser will be deemed to have actual notice of a prior interest in the property if he is aware of such facts and circumstances as would put a man of ordinary intelligence and prudence on such inquiry that, if diligently pursued, would lead to knowledge of those prior interests." *Id.* (citation omitted). Whether an individual qualifies as a bona fide purchaser is a question of fact. *See Smith v. Parker,* 67 Ark.App. 221, 226, 998 S.W.2d 1, 4 (1999) (citation omitted).

■■■ In both the Ruth Lane and Lakeridge Properties, the facts demonstrate clearly that Defendants' mortgages were granted by and recorded against entities (either RTC or Debtor, individually) which were not record owners of the property mortgaged.[5] Therefore, absent any other

---

5. In pre-trial submissions, Defendants argue that the lis pendens filings and Shoptaw quitclaim deeds relate back to prior transfers and operate to perfect their interests in the properties under the after-acquired title statute, Ark.Code Ann. § 18–12–601, prior to the preference period. However, because the Court

has found that the lis pendens filings and Shoptaw quitclaim deeds constitute avoidable preferences, the doctrine of after-acquired title is not effective to secure Defendants' interests, if any, in these properties. Moreover, unlike certain cases cited in Defendants' briefs, the facts in this situation do not involve

argument, since Defendants' mortgages were not properly recorded against the entities which possessed legal interests in the properties, those mortgages did not affect title to the properties and would not operate as constructive notice. *See* Ark. Code Ann. §§ 14–15–404(a), 18–40–102; *Frank Kendall Lumber Co. v. Smith*, 87 Ark. 360, 112 S.W. 888, 889 (1908) (finding that a grantee of one without title or interest in the land conveyed acquires no interest therein); *Sims v. Stovall*, 127 Ark. 186, 191 S.W. 954, 959–60 (1917) (finding that where grantors had no conveyable rights in real property, their deeds were invalid and would be cancelled).

However, Defendants contend that they possess equitable interests in the properties and that Trustee had constructive notice of their interests. On the Lakeridge Property, Defendant Regions argues that it has an equitable lien based on the fact it accepted a mortgage executed by RTC based on a belief that the property had been transferred by deed from Piney Bay to RTC and that Trustee cannot attain the status of bona fide purchaser due to the lis pendens filing. For Ruth Lane, Defendants argue essentially that the lis pendens filings, the timing of the transfers of this property, the severance of the surface and mineral rights, as well as the alleged indicant of Debtor's actual possession of the property (such as payment of utility bills and maintenance of horses on the property), would have placed a purchaser on "inquiry" notice, thus precluding Trustee from acquiring bona fide purchaser status. Defendants argue for reformation of the relevant instruments and for imposition of constructive and resulting trusts in their favor.

### A. Lis Pendens and Equitable Trusts

The Court will address a number of Defendants' arguments prior to determining whether Trustee attained bona fide purchaser status and whether reformation of the relevant instruments is warranted.

First, there is no need to determine whether the lis pendens filed by Defendants affect whether or not the Trustee is a bona fide purchaser under 11 U.S.C. § 544(a)(3), since the Court has already determined that these filings are avoided preferential transfers. The Court of Appeals for the Eighth Circuit has stated that "11 U.S.C. § 547 allows a trustee to *void* any transfer of the debtor's property made within ninety days of the filing of a bankruptcy petition...." *In re Muncrief*, 900 F.2d 1220, 1222 n. 2 (8th Cir.1990) (emphasis added). "Void" means "[o]f no legal effect; null." BLACK'S LAW DICTIONARY 1568 (7th ed.1999). Similarly, "avoid" means "to render void." *Id.* at 132. To give effect to these lis pendens filings for notice purposes when the Court has found them to be avoided preferential transfers would contradict the very meaning of the terms "void" and "avoid." Accordingly, Defendants do not prevail on their argument that their lis pendens filings preclude Trustee from attaining bona fide purchaser status under these facts.[6]

the simple defective acknowledgment of a mortgage; rather, as stated above, the entities that mortgaged these properties to Defendants in fact had no legal interest in the properties themselves.

6. Alternatively, even if it were to engage in an analysis of constructive notice based on lis pendens filings, the Court finds the analysis on this point contained in *Hunter v. Bank of* New York *(In re Anderson)*, 266 B.R. 128 (Bankr.N.D.Ohio 2001) to be persuasive, well-reasoned, and equally applicable to the Arkansas lis pendens statute and case law thereunder. In *Anderson*, the court found that to impose constructive notice against a trustee based on a lis pendens filing would render 11 U.S.C. § 544(a)(3) practically superfluous, "as a bankruptcy trustee would almost always

■ Second, Defendants' arguments that constructive or resulting trusts should be imposed on these properties fail. In pretrial submissions, Defendants cite a number of cases in support of the proposition that the imposition of equitable trusts would be appropriate in the matters before the Court. Although the Court agrees that it possesses the authority to impose equitable trusts, the Court disagrees with Defendants that the facts of the cases at bar warrant the exercise of that authority. In Arkansas, "[a] constructive trust is an implied trust that arises by operation of law when equity demands ... [and is] imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Tripp v. C.L. Miller*, 82 Ark.App. 236, 244, 105 S.W.3d 804, 810 (2003) (citations omitted). Defendants ask the Court to secure their mortgages "by operation of law," arguing that equity requires such action. But the equitable "operation of law" was not meant to be applied in situations such as the ones described at trial. No entities are better situated to properly perfect interests in land than banks, whose purposes are to maximize profit derived from lending money and to ensure the repayment of their loans by taking an interest in a borrower's collateral. Courts can not underwrite Defendants' business risks under the guise of equity when Defendants themselves failed to take minimal steps to ensure their interests were properly protected.

■ Additionally, "[t]o impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts ... [and the] burden is especially great when title to real estate is sought to be overturned by parol evidence." *Id.* (citations omitted); *see also Waller v. Waller*, 15 Ark.App. 336, 339, 693 S.W.2d 61, 63 (1985) ("The general rule, as well as the established rule in this state, seems to be well settled that in order for one to establish by parol either a resulting or constructive trust, the evidence must be 'full, clear and convincing,' 'full, clear and conclusive,' 'of so positive a character as to leave no doubt of the fact,' and 'of such clearness and certainty of purpose as to leave no well founded doubt upon the subject.'") (citation omitted). In light of the fact that Defendants used parol evidence extensively in an effort to overturn recorded instruments on the properties at issue, there is no clear, full, and convincing evidence that the equities of these matters dictate the imposition of constructive or resulting trusts, especially when "in a bankruptcy case, there is nothing equitable about taking money away from unsecured creditors and giving it to a creditor [in this instance, both Defendants] that failed to protect its own interests when it had a chance to do so." *Anderson*, 266 B.R. at 134–35 (citing *In re T. Brady Mechanical Services Inc. v. Moran*, 129 B.R. 559, 563 (Bankr.N.D.Ill. 1991)) (further citations omitted). Defendants' failure to adequately safeguard their own interests in these matters is discussed in further detail later in this Opinion.

have constructive notice of a party's equitable lien." *Anderson*, 266 B.R. at 136 (citations omitted). Accordingly, the court found that trustee's potential constructive notice of an equitable lien would not negate a trustee's avoidance powers under 11 U.S.C. § 544(a)(3), in situations where the trustee

seeks to avoid a mortgage interest that was either improperly executed or not recorded under relevant state law and "the creditor seeks to impute constructive notice through the doctrine of lis pendens." *Id.* at 137; *see also In re Leonard*, 197 B.R. 78 (Bankr. N.D.Ill.1996).

### B. Reformation and Bona Fide Purchaser

The Court now turns to whether reformation of the relevant instruments in Defendants' favor is warranted under these facts and state law. In Arkansas, reformation of instruments is an equitable remedy which is appropriate when, although there is a complete agreement, the written instrument evidencing the agreement does not correctly reflect the terms of that agreement due to mutual mistake of the parties. *Statler v. Painter,* —— Ark.App. ——, 133 S.W.3d 425, 428, 2003 WL 22853852, at *2 (2003) (citation omitted). "A mutual mistake is one that is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument." *Id.* (citation omitted). "A mutual mistake must be shown by clear and decisive evidence that, at the time the agreement was reduced to writing, both parties intended their written agreement to say one thing and, by mistake, it expressed something different." *Id.* (citation omitted) The determination of whether there is a mutual mistake warranting reformation is a question of fact. *Id.* (citation omitted).

Defendants fail to understand the difference between the doctrine of mutual mistake as stated above and mistakes in business judgment. Defendants characterize their reliance on Debtor to safeguard their interests regarding the properties in question as a mistake. Of course, in hindsight, it was undoubtedly a mistake for Defendants to have relied on Debtor's representations and commitment for title insurance. But Defendants' mistakes in relying on Debtor to do what she allegedly said she would are not mutual mistakes with respect to the terms of the written instruments. Defendant Regions loaned money secured by the Ruth Lane Property with full knowledge that Debtor was not the record owner of that property; Debtor simply did not transfer the property as she represented she would. First Arkansas and Regions both relied on Debtor and her company to provide title commitments on the properties securing loans. Instead of seeking an independent company to provide such commitments, Defendants relied on the person or entity who had the greatest interest in stating there was, in fact, proper title in these properties, with First Arkansas reasoning that to do otherwise would have been insulting to Debtor. Mr. Tarpley even acknowledged that he did not ever consider that it might not be wise to allow Debtor to handle the paperwork on her own loan.

Such reliance on Debtor constitutes a mistake in business judgment, not an error or mistake that the Court should reform in the documents themselves. This mistaken business judgment is not a scrivener's or draftsman's error which should be remedied in equity. Defendants are sophisticated financial institutions, and if they choose to lend money under the circumstances described at trial, relying on Debtor personally or one of her own companies to safeguard their business interests, they must be prepared for the possible consequences of those decisions.

Even if the Court were to find that Defendants' mistakes do meet the definition of mutual mistake as stated above, the Court would not find that those mistakes were shown by clear and decisive evidence. The alleged mistakes, both between Debtor and Defendants and between Debtor and the Shoptaws rest, of necessity, on Debtor's testimony, since she was a party to all transactions. However, her combative demeanor on direct examination, her convenient memory lapses when confronted with her prior deposition

testimony,[7] her statements at trial that she did not understand the questions in her prior deposition, when her answers clearly showed she did understand, all lead the Court to discount her testimony at trial and to find that she was not a credible witness. Accordingly, on that basis, the Court will not reform the relevant instruments, both between Debtor and the Shoptaws or between Debtor and Defendants.[8]

 On a broader note, equity does not favor Defendants where the evidence showed that the Shoptaws believed that they had been threatened with legal action in an attempt to have them execute additional quitclaim deeds. It is particularly troubling that Ms. Shoptaw believed that Debtor would, potentially face criminal prosecution, if Ms. Shoptaw did not cooperate in executing additional quitclaim deeds.

 Moreover, even assuming *arguendo* there were mutual mistakes in these transactions, "a party cannot obtain reformation if reformation would prejudice a subsequent bona fide purchaser." *Statler*, 133 S.W.3d at 429, 2003 WL 22853852, at *3 (citing *Maurice v. Schmidt*, 214 Ark. 725, 218 S.W.2d 356 (1949); 76 C.J.S. *Reformation of Instruments* § 58 (1994); 66 Am.Jur.2D *Reformation of Instruments* § 62 (2d ed.2001); 14 Richard Powell, *Powell on Real Property* § 81A.07[3][d] (2000); 2 *Dobbs Law of Remedies* § 11.6(1) at 743, 754 (2d ed.1993); Annot., *Right to Reformation of Contract or Instrument as Affected by Intervening Rights of Third Persons*, 79 A.L.R.2D 1180, 1961 WL 12997 (1961 & Supp.2000)). Nor will reformation lie where the rights of innocent third parties are prejudiced. *See Drew County Bank & Trust Co. v. Sorben*, 181 Ark. 943, 28 S.W.2d 730, 731 (1930) ("Even a reformation of appellant's mortgage would not relate back to the date same was recorded so as to bind or affect third parties.").

 The Court finds that neither the transfers related to the Ruth Lane Property nor the timing of those transfers would place an individual of ordinary intelligence and prudence on inquiry notice so as to preclude bona fide purchaser status. The chain of title is clear on its face that at the time of her bankruptcy filing, Debtor owned the surface rights and Helen Nelson owned the mineral rights. Arkansas law permits the severance of mineral from surface rights. *See, e.g., Bonds v. Carter*, 348 Ark. 591, 75 S.W.3d 192 (2002); *Taylor v. Scott*, 285 Ark. 102, 685 S.W.2d 160 (1985); *Garvan v. Kimsey*, 239 Ark. 295, 297, 389 S.W.2d 870, 871 (1965) ("Our cases have consistently held that conveyance by deed constituted an effectual constructive severance of the mineral rights from the fee ...."). Therefore such severance is not unusual and would not necessarily place an individual on inquiry notice.

 As for Debtor's alleged continued possession as indicia of a prior interest sufficient for inquiry notice, the Court, as stated above, finds Debtor's credibility to

---

7. The Court considered as substantive evidence only those portions of Debtor's prior deposition for which she demonstrated an inability at trial to recall. Counsel for both Defendants stated at trial that she had no objection to the Court's consideration of those portions of the deposition for which Debtor testified she had no memory. The Court also considered the portions of Debtor's deposition raised at trial for impeachment purposes.

8. In fact, in order to achieve the stated wishes of Debtor and Defendants as to the Ruth Lane Property, the Court would first have to reform the 1997 deed conveying this property to Piney Bay so as to reflect a transfer of all interest of Helen Nelson's interests to Piney Bay, rather than simply surface rights. However, no adequate evidence of mistake on this deed was introduced at trial.

be lacking and does not give her testimony full credence. In addition to the reasons stated previously in this Opinion, Debtor's lack of credibility is further evidenced by the contradictions within her testimony at trial (first Debtor stated she was the owner of horses on Ruth Lane, then she stated that she thought her daughter owned them, and finally Debtor stated that she did not know who owned them) and the contradiction between Debtor's original testimony regarding horse ownership and her failure to list these horses on her bankruptcy schedules.

Even assuming the Court accepted Debtor's testimony on the indicia of ownership, an Arkansas court has found that even the presence of 70–foot tall grain bins was not sufficient to put purchasers on notice of an unrecorded lease. *See Garmon v. Mitchell*, 53 Ark.App. 10, 918 S.W.2d 201 (1996). Therefore, even in light of such exercise of control over the property that Debtor allegedly exhibited, the Court finds such actions insufficient to place a subsequent purchaser on inquiry notice under these facts. The Court notes that it is the height of irony for Defendant First Arkansas to opine at trial that there were problems with the chain of title on this property such that a purchaser should have been on notice, yet lend money secured by this property, while failing to take the necessary action itself to assure clear title.

Regarding the Lakeridge Property, the Shoptaw quitclaim deeds of March 2002 do not affect the title, since they transferred no interest in that property, and do not place a bona fide purchaser on inquiry notice. Since the lis pendens filings on both properties have previously been avoided, the Court finds that at the time of Debtor's bankruptcy filing, Trustee had the status of a bona fide purchaser as to both the Ruth Lane and Lakeridge Prop-

erties. Reformation of the relevant instrument in favor of Defendants is therefore not warranted. Other courts considering the issue of reformation of instruments and bona fide purchasers have reached similar conclusions. *See In re Beaulac,* 298 B.R. 31 (Bankr.D.Mass.2003) (no reformation of mortgage where rights of intervening lienholders, such as trustee, would be prejudiced); *In re Miller,* 286 B.R. 334 (Bankr.E.D.Tenn.1999) (court will not reform quitclaim deed even upon showing of mutual mistake if rights of innocent third parties have intervened); *In re Peebles,* 197 B.R. 799 (Bankr.W.D.Pa.1996) (equitable principles of reformation not applicable against a bona fide purchaser); *In re Pribish,* 25 B.R. 403 (Bankr.D.Me.1982) (individual debtors who conveyed real estate in fact owned by their debtor-corporation not entitled to reform deeds by giving record title to purchasers, since such reformation would prejudice intervening rights of trustee of debtor-corporation).

■ Finally, although Defendants may have equitable interests in both the Ruth Lane and Lakeridge Properties, "an equitable lien created on account of an improperly executed or unrecorded mortgage will not defeat a bankruptcy trustee's interest in the debtor's property for purposes of 11 U.S.C. § 544(a)(3)." *Anderson,* 266 B.R. at 135 (citing *Placer Savings & Loan Association v. Walsh (In re Marino),* 49 B.R. 600, 603 (N.D.Cal.1985) (section 544(a)(3) enables the trustee to take title to the real property free from all equitable liens) *citing Stepp v. McAdams,* 88 F.2d 925, 928 (9th Cir.1937); *In re Hendleman,* 91 B.R. 475, 476 (Bankr.N.D.Ill.1988) (an equitable lien in the debtor's property by definition is unperfected and thus can never survive attack by a Chapter 7 Trustee); *In re Chenich,* 100 B.R. 512, 513–15 (9th Cir. BAP 1987); *McRoberts v. Transouth Financial (In re Bell),* 194 B.R. 192, 196

(Bankr.S.D.Ill.1996) (equitable liens arising under state law are contrary to the letter and purpose of the Bankruptcy Code and are, therefore, ineffective against a trustee's § 544(a) avoiding powers)). There is no need to reiterate the reasoning in *Anderson* on this issue, other than to state that this Court finds such reasoning persuasive. In sum, although Defendants may have causes of action against both Debtor and her corporations, they will not prevail against Trustee in this situation.

### CONCLUSION

The Shoptaw deeds, recorded in March 2002 on the Ruth Lane Property and the lis pendens filings recorded on both the Ruth Lane and Lakeridge Properties are avoided as preferences under 11 U.S.C. § 547(b). The Shoptaw deeds, recorded in March 2002 on the Lakeridge Property are ineffective, as they convey no interest in that property, and do not constitute constructive notice. Since the mortgages granted on the Ruth Lane and Lakeridge Properties were not granted by the record owners of those properties and the Defendants failed to record their mortgages against the record owners of those properties, those transfers are ineffective. Under the facts and foregoing analysis, the Court will not exercise its equitable powers to reform the relevant instruments for the benefit of Defendants. Any equitable interests Defendants may have on the Ruth Lane and Lakeridge Properties are ineffective against Trustee's interest.

A separate judgment in accordance with this Opinion will be entered.

**IT IS SO ORDERED.**