James O. HELTON, d/b/a Helton & Helton Construction Company, Plaintiff-Appellant,

v.

George ANGELOPOULOS, et ux., et al., Defendants-Appellees.

Supreme Court of Tennessee, at Knoxville.

March 8, 1982.

Gary E. Brewer, Morristown, for plaintiff-appellant.

Dennis H. Inman, Frank P. Cantwell, Jr., Morristown, Douglas L. Dutton, Knoxville, (Hodges, Doughty & Carson, Knoxville, of counsel), for defendants-appellees.

## OPINION

HARBISON, Chief Justice.

This case presents the question of whether a licensed general contractor forfeits his right to recover on a building contract when construction costs exceed the monetary limits of the contractor's license. Under the facts of this case we are of the opinion that recovery should be allowed. The decisions of the trial court and of the Court of Appeals to the contrary are reversed and the cause is remanded to the trial court for further proceedings.

The general contractor, appellant Helton, has been licensed by the Tennessee Board for Licensing General Contractors since 1963. He was licensed for both residential and commercial building. When the contract involved in this case was executed and during the time of its performance, appellant's license had a monetary limit of $250,000. Because the final construction cost of the project exceeded that amount, both the trial court and the Court of Appeals held that the contractor was precluded from re-

covering the balance admittedly owing to him by the owners pursuant to a written contract.

This contract was a standard AIA cost-plus-fixed-fee agreement. There was no specified maximum cost limit. The agreement was executed on July 24, 1978, and on the same day the owner entered into a written agreement with a firm of architects and engineers who were to provide plans, specifications and supervision for the construction of a new restaurant in Morristown, Tennessee. Preliminarily the architects had given the owners an informal estimate of the cost of the project at $185,-000. Appellant had also given an informal estimate slightly higher, at $213,000, including his fee. The architects had advertised the project in a commercial magazine circulated among members of the building trade, and this advertisement showed the restaurant project as being in the general category of $250,000. This amount was within the limits of the contractor's license, $250,000 plus a ten percent tolerance permitted by the licensing agency.[1]

The owners began discussions of their proposed new restaurant with the architect and others in the spring of 1978. They wished to have it completed by November 1. When the contract with appellant was signed, it contained a penalty clause of one hundred dollars per day for each working day after that date. In a counterclaim asserted against the contractor by the owners, the trial court enforced this penalty, and the Court of Appeals affirmed with some modification.

Since time was apparently so important, the architects arranged with the owners to provide plans and specifications on a "fast track" method. They prepared only a general description of the work without detailed plans and specifications and took competitive bids from appellant and a number of other general contractors. Operating without complete plans and specifications, the contractor was supposed to complete site preparations while specifications

---

1. Tennessee Rules & Regulations § 0680–1–.13.

for other phases of the work were being prepared. Since appellant's contract was entered into on July 24, the deadline of November 1 permitted only slightly more than ninety days for completion of the work. Appellant was not furnished with complete plans and specifications for the project, however, until September 14, after the expiration of almost half the allotted time for performance. The architect and owner handled the letting of bids for the major subcontractors, and these were not received until September 19 and September 21. They were considerably higher than the architect had originally anticipated, and the owners engaged in extensive negotiations with the subcontractors to reduce costs. The owners also did much of the purchasing of materials for the job, and the bills for these costs did not pass through the hands of the contractor. The owners had separately contracted for the purchase and installation of kitchen equipment and interior decorating. They also made changes and additions to the plans supplied by the architect.

Under these circumstances it would have been extremely difficult for any contractor to keep an accurate account of what the costs of the project were. Appellant was supplying a considerable amount of labor for the job, and he had records, of course, of these costs. Not until January 1979, however, at a meeting between the owners, the architect, the contractor and several subcontractors, was appellant ever advised of the total construction costs as finally computed by the architects, $288,771.50. This figure included the contractor's own fee of nine percent, but did not include the fee of the architects. The total was $13,771.50 more than the limit on the contractor's license with the ten percent tolerance permitted by state regulations above referred to.

The original action in this case was instituted by the contractor against the owners for the unpaid balance of his specified fee. All of his labor costs had been paid, and the owners had paid the material costs directly to vendors. They had paid only $6000 on the contractor's fee, however, and the trial court found that he was entitled to an additional $19,989.44. This computation may not be correct. The total of $25,989.44 apparently allowed by the Chancellor seems to be nine percent of $288,771.50. The latter figure, however, *included* the contractor's fee, and he should not be allowed nine percent of that figure. Otherwise we approve the computations made by the trial judge, together with his disallowance of interest upon both the claim of the contractor and the counterclaim of the owners as being disputed items. We further approve the adjustment made by the Court of Appeals in the penalty award against the contractor.

Because the total construction costs exceeded the limit on the contractor's license, however, the trial judge and the Court of Appeals disallowed any recovery to him, relying upon the cases of *Farmer v. Farmer*, 528 S.W.2d 539 (Tenn.1975) and *Santi v. Crabb*, 574 S.W.2d 732 (Tenn.1978).

It should be noted at the outset that both the *Farmer* and the *Santi* cases involved contractors who were operating entirely without a license. In neither case did the record indicate that the contractor had even attempted to obtain a license or to comply with the regulatory statutes. It was under those circumstances that this Court held that such an unlicensed contractor should be precluded from any recovery, either in contract or in quantum meruit. The public policy of the State requiring licenses and the protection of the consuming public from unqualified builders were deemed to require this result as a matter of common law. Subsequently the legislature changed that public policy by an amendment to the statutes in 1980, expressly permitting courts of equity to award unlicensed general contractors actual expenses upon a showing of clear and convincing proof. 1980 Tenn.Pub. Acts, ch. 652; T.C.A. § 62–603(c). Further, in the recent case of *Coleman v. Anderson*, 620 S.W.2d 77 (Tenn.1981), this Court declined to apply the rule of the *Farmer* and *Santi* cases, *supra*, to a situation where a contractor had in fact made application for a license and had consulted with officials of

the licensing agency. He was advised by the latter that a particular contract which he was about to undertake did not fall within the provisions of the licensing statute and that he did not need a license for that proposed work. The official proved to be mistaken, but the contractor in good faith followed her advice and performed the work. Under those circumstances he was not denied recovery altogether, but was permitted to recover his actual expenses.

Sanctions such as forfeiture against completely unlicensed personnel are one thing. Sanctions against contractors who have complied with the licensing laws, however, and who may in some manner violate the provisions or limitations of their respective licenses, are a different matter. We are of the opinion that both the trial court and the Court of Appeals erred in extending the rule of the *Farmer* and *Santi* cases to the present situation, where the contractor did in fact have a good and valid license outstanding at all times.

Provisions for monetary limits on contractors' licenses have been authorized by regulations for several years. The governing statutes were comprehensively rewritten in the Contractors Licensing Act of 1976, 1976 Tenn.Pub.Acts, ch. 822, now codified as T.C.A. §§ 62–601 to 626. That statute itself was significantly amended in 1977, 1977 Tenn.Pub.Acts, ch. 406. The 1976 and 1977 statutes govern the present case.[2]

In 1977 language was added to the controlling statutes expressly authorizing the previous practice of the Board in fixing limitations upon contractors' licenses. The statute provided:

"The board shall state the general construction classifications and/or the specialty classification in which the applicant is qualified to engage in (sic) as a contractor and for each classification shall list the monetary limitations thereon as determined by the board." 1977 Tenn. Pub.Acts, ch. 406, § 2 (now T.C.A. § 62–612).

The Board, in its current regulations, has specified a large number of classifications for contractors' licenses. There is no question in the present case, however, that appellant undertook to perform work outside of the authorization or coverage of his license.

The purpose of a monetary limitation, of course, is to afford financial security to owners, vendors and others dealing with a contractor. The Board requires financial data in connection with a contractor's application. Further data may be required if the contractor wishes to increase the limits on his license, as appellant did in the present case after learning that there had been the slight overrun referred to above.

The trial court was of the opinion that it was the "completed cost" of the project which governed the limits on the contractor's license. If those completed costs exceeded the license limit, the trial court treated the contractor as though he were an entirely unlicensed individual. He stated that he recognized that this was a harsh rule, but both he and the Court of Appeals felt that the result was dictated by the *Farmer* and *Santi* cases, *supra.*

An examination of the provisions of the licensing law convinces us otherwise.

Prior to the comprehensive 1976 revision, the statutes provided relatively minor sanctions against an unlicensed contractor. On the other hand, there are and always have been numerous sanctions which might properly be imposed upon a license holder, both by the courts and by the administrative or licensing agency.

T.C.A. § 62–620, carrying forward somewhat similar provisions of prior law, expressly requires any architect or engineer preparing plans or specifications for a construction project to require a contractor submitting a bid to furnish his license number, expiration date and applicable classification. Otherwise his bid is not supposed to be opened. The record in the present case is silent on that point, but there is no indi-

---

**2.** Further amendments were made to the statutes in 1979, 1980 and 1981, but these amendments do not apply to the contract now under consideration.

cation that either the architect or appellant failed to comply with these statutory provisions. The license number of appellant appears on most of the contract documents exhibited in the record.

T.C.A. § 62–621 provides serious penal sanctions upon both an owner and an architect or engineer who accept a bid from a person who is not licensed, as well as imposing other sanctions upon a contractor undertaking to contract without a license or in violation of the terms of his license. Further, T.C.A. § 62–619 provides that when any person claims to have been damaged by the negligence, incompetency, fraud or misconduct of a licensed contractor, a court trying such case may, as part of its judgment or decree, revoke the license of the contractor. Reinstatement of the license is then made a matter for determination by the licensing agency.

It therefore seems to us that if a licensed general contractor fraudulently, or in bad faith, or through collusion with an architect or engineer, submitted a bid upon a project obviously beyond the monetary limit on his license, ample sanctions, both civil and criminal, are available either through the courts or through the licensing agency. A rather complete statutory scheme exists for dealing with violations by licensed personnel, as contrasted with individuals or firms which, under prior law, undertook to operate in a regulated field without any attempt at compliance with the licensing requirements.

The violation found by the courts below in the present case was technical at most. There is no indication that the contractor, the architect or the owner at any time acted in bad faith. The trial judge, in a companion case tried with the present suit, held that the architectural firm had been guilty of negligence and had breached its obligations to the owners in not estimating costs more accurately. He allowed recovery to the owners on their counterclaim against the architect based partly upon this breach of professional standards. No appeal was taken as to that aspect of this lengthy non-jury trial, which involved a number of consolidated cases.

There is no indication that the contractor himself, however, was guilty of negligence in submitting his bid. This, as previously stated, was a cost-plus bid with no maximum specified ceiling and without complete plans or specifications in view of the "fast track" method of supplying the latter which had been agreed upon by the owner and the architect. The record not indicating otherwise, we must presume that both the architect and the contractor complied with T.C.A. § 62–620 and that the contractor did reveal to the architect, who was the owner's representative, the limitations on the contractor's license. Nothing in the record indicates that either the contractor or the architect had any reason to expect that costs would exceed these limitations until the project was far advanced. A substantial portion of the cost overrun may be attributable to changes made by the owners, or at their direction. Any complaints which the owners have voiced with respect to the quality of the work, delays, or necessity for corrective work have been fully litigated and included in the counterclaim judgment awarded to the owners.

Consolidated with the actions brought by appellant and by the architect were some claims of materialmen and suppliers. We are of the opinion that these claims were properly disposed of by the trial court and the Court of Appeals, and we affirm their judgments with respect thereto.

The judgment of the trial court and the Court of Appeals dismissing the contractor's claim is reversed. The cause is remanded for further proceedings, including proper computation of the contractor's fee, and entry of judgment consistent herewith. Costs incident to the appeal will be taxed equally to appellant and to the owners-appellees. All other costs will be fixed by the trial court.

FONES, COOPER, BROCK and DROWOTA, JJ., concur.