IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 22, 2012 Session

## ANCHOR PIPE COMPANY, INC. v. SWEENEY-BRONZE DEVELOPMENT, LLC ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 2008CV31941      C.L. Rogers, Judge**

---

**No. M2011-02248-COA-R3-CV - Filed August 2, 2012**

---

This appeal concerns the priority of two liens, a mechanic's lien and a bank's deed of trust. We have determined that the trial court erred in granting summary judgment in favor of the bank. We have further determined that the mechanic's lien is entitled to priority and that the trial court erred in failing to grant summary judgment on that issue.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Todd E. Panther and Stephen Andrew Lund, Nashville, Tennessee, for the appellant, Anchor Pipe Company, Inc.

James Campbell Bradshaw and David Andrew Amonette, Nashville, Tennessee, for the appellee, Trust One Bank.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The facts underlying this case arose during the development of Enoch Hills subdivision in Gallatin, Tennessee. Prior to the construction of residential lots, the property was owned by JSC, LLC. Jeffrey Bronze negotiated with James Thigpen, the president of Anchor Pipe Company, Inc. ("Anchor") about doing work on the property. It is undisputed that Anchor had a valid contractor's license with a monetary limit of $750,000.00 throughout the relevant time period. Anchor gave a total bid of $3,521,952.00 on the work to be

performed on this project. Bronze engaged Anchor to do the work, and Anchor began work on the property in February 2007.

In May 2007, JSC, LLC transferred title to the property to Sweeney-Bronze Development, LLC ("SBD"). Trust One Bank, which provided a construction loan to SBD, recorded a deed of trust on July 24, 2007. Although SBD held title to the property, a different entity—Sweeney-Bronze Holdings ("SB Holdings")—was the grantor of the bank's deed of trust. Anchor continued to perform work on the property. On June 27, 2008, Bronze told Anchor that he could no longer pay for the work, and Anchor stopped all work on the project. As of that date, SBD had paid Anchor $659,579.06 for work on the project.

On July 1, 2008, Anchor recorded a notice of lien against the property in the amount of $703,192.84; and, on July 25, 2008, Anchor recorded a notice of lien in the additional amount of $140,396.55. On November 12, 2008, a deed was recorded transferring title from SBD to SB Holdings. The bank recorded an amended and restated deed of trust on the same day, again (this time, correctly) listing SB Holdings as the grantor. Anchor recorded an amended lien on June 10, 2009 for a total claim of $625,864.

On June 17, 2009, Anchor filed a verified amended complaint against SBD, SB Holdings, Bronze Construction, LLC, Jeffrey Bronze, Jeffrey Sweeney, JSC, and Trust One Bank.[1] In its complaint, Anchor set forth causes of action for breach of contract, unjust enrichment, enforcement of lien, and violation of the Prompt Pay Act; Anchor also sought a declaratory judgment that its lien took priority over the bank's deed of trust. The bank and Anchor filed cross-motions for summary judgment.

The motions for summary judgment were heard in August 2011, and the court reached the following pertinent conclusions:

Contractor is found to be not licensed for the project from its inception. Contractor is allowed recover[y] of only documented expenses pursuant to T.C.A. § 62-6-103(b). Absence of a valid contractor's license causes a forfeiture of lien rights. Counsel for Contractor relies upon case law which is distinguishable from the case at hand. In the case before this Court, the Contractor was not properly licensed at the inception of the contract not thereafter, contrary to case law relied upon by counsel.

Reasonable minds could not differ the January 20, 2007 e-mail between Contractor and Developer represents an agreement by Contractor to

_____

[1]The original complaint to enforce lien is not a part of the record on appeal.

subordinate its lien to Bank. The Construction Loan, after such agreement, was thereafter made. The material e-mail facts are not disputed. Counsel for Contractor puts forth argument [that] such subordination is not enforceable because no written subordination or release was sent to or signed by his client. The Court finds no legal requirement calling for a written agreement in this case.

It is not necessary to address the dispute between Bank and Contractor as to visible commencement of work.

Based upon this analysis, the trial court determined that the bank was entitled to judgment and dismissed Anchor's claims against the bank. Upon the bank's subsequent motion, the trial court entered an order on September 20, 2011 making the court's order granting summary judgment to the bank a final order.

Anchor appeals the trial court's decision granting summary judgment to the bank. Anchor asserts that, contrary to the trial court's conclusions, it has lien rights and those rights take priority over the bank's lien rights.

STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn. 2003). In reviewing a summary judgment, this court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49, 50 (Tenn. 1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v.. Ruiz,* 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we must determine whether factual disputes exist. *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn. 1993). If a factual dispute exists, we must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Id.; Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must negate an element of the opposing party's claim or "show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.,* 270 S.W.3d 1, 8-9 (Tenn. 2008).

ANALYSIS

1.

Anchor's first argument is that the trial court erred in concluding that it was an unlicensed contractor. The pertinent facts on this issue are not in dispute: Anchor had a contractor's license throughout its work on the project, and this license authorized Anchor to perform the type of work it performed (underground piping, grading and drainage, and base and paving work). The monetary limit on Anchor's license, however, was $750,000, whereas Anchor's bids exceeded two million dollars. The bank asserts, and the trial court agreed, that Anchor was unlicensed because it bid on and performed work in excess of the monetary limits of its license.

We are presented with a question of law: whether a contractor who contracts for work above the monetary limit applicable to his license is an unlicensed contractor for purposes of the Contractors Licensing Act of 1994, Tenn. Code Ann. § 62-6-101 *et seq.* This act requires persons or entities performing activities defined as "contracting" to have a license, and makes it unlawful for a person or entity to engage in contracting without a license. Tenn. Code Ann. §§ 62-6-101, 62-6-103(a). In ruling against Anchor, the trial court relied upon the following statutory provision:

> Any unlicensed contractor covered by the provisions of this chapter shall be permitted in a court of equity to recover actual documented expenses only upon a showing of clear and convincing proof.

Tenn. Code Ann. § 62-6-103(b) (2008) (rewritten by chapter 482 of the Tennessee Public Acts of 2009).[2] Because it considered Anchor to be "unlicensed," the trial court held this provision applied.

We disagree with the trial court's legal conclusion that Anchor should be considered unlicensed. We find instructive the Supreme Court's analysis in *Helton v. Angelopolous*, 629 S.W.2d 15, 16 (Tenn. 1982), a case in which the actual construction costs ended up exceeding the monetary limitations on the contractor's license. *Id.* at 17. The contractor sued the property owner for the unpaid balance on a building contract. In examining the applicable common law and statutory background, the Court noted the underlying public policy of protecting "the consuming public from unqualified builders." *Id.* The Court went on to distinguish between contractors who are "completely unlicensed" from those "who have complied with the licensing laws . . . and may in some manner violate the provisions

_____

[2]Because this case arose before the new version of the statute took effect, our analysis is under the prior version.

-4-

or limitations of their respective licenses." *Id.* at 18. As to the monetary limitations on contractors' licenses, the Court found their purpose to be "to afford financial security to owners, vendors and others dealing with a contractor." *Id.*

There was no evidence that the contractor in *Helton* was guilty of any negligence in submitting his bid. *Id.* at 19. The Court observed, however, that there were other means (apart from precluding the contractor from recovering on the contract) for addressing violations by licensed contractors:

> [I]f a licensed general contractor fraudulently, or in bad faith, or through collusion with an architect or engineer, submitted a bid upon a project obviously beyond the monetary limit on his license, ample sanctions, both civil and criminal, are available either through the courts or through the licensing agency. A rather complete statutory scheme exists for dealing with violations of licensed personnel, as contrasted with individuals or firms which, under prior law, undertook to operate in a regulated field without any attempt at compliance with the licensing requirements.

*Id.* Based on this reasoning, the Court reversed the decision of the lower courts dismissing the contractor's claim. *Id.*

While *Helton* was decided based largely on caselaw, we consider its distinction between unlicensed contractors and contractors bidding above the monetary amount of their license to be relevant here. The purpose of the monetary limit is to ensure the contractor's financial security and stability. *Id.* at 18. There is a regulatory scheme set up to address violations of the monetary limits by licensed contractors. *Id.*; *see* Tenn. Comp. R. & Regs. § 0680-01-.13, -.19. Furthermore, the case before us involves a dispute between a contractor and the bank that provided financing to the developer. It has generally been held that the rule restricting "an unlicensed contractor's access to court does not apply to disputes between contractors and other licensed professionals in the construction business." *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998); *see also Gene Taylor & Sons Plumbing Co., Inc. v. Corondolet Realty Trust*, 611 S.W.2d 572, 575-76 (Tenn. 1981); *Roberts v. Yarbrough*, No. 01-A-01-9802-CH00096, 1999 WL 43252, at *2 (Tenn. Ct. App. Feb. 1, 1999). This rationale seems equally applicable here where the bank was in the business of approving construction loans and reviewing the credentials of contractors. The public policies underlying Tenn. Code Ann. § 62-6-103(b)–namely, protecting the safety and property of the public–are not

implicated in a dispute between knowledgeable professionals.[3]

We, therefore, conclude that Anchor was not an unlicensed contractor under Tenn. Code Ann. § 62-6-103(b).

2.

Anchor also argues that, even if it were considered an unlicensed contractor, it would retain its lien rights. We agree.

In asserting that an unlicensed contractor forfeits its lien rights, the bank cites *Dotson v. Gaidos*, 736 S.W.2d 119 (Tenn. Ct. App. 1987), a suit brought by an unlicensed contractor against the property owner to recover damages and assert a lien. The appellate court agreed with the lower court's conclusion that the fact that the contractor was unlicensed meant that he could not assert a lien against the defendants' property.[4] *Id.* at 120. Our interpretation of *Dotson*, however, must account for the General Assembly's passage of related legislation in 1994--what is now Tenn. Code Ann. § 62-6-128.

Tennessee Code Annotated § 62-6-128 provides that Title 66, chapter 11—the provisions governing mechanic's and materialmen's liens–"shall not be available on single family residential construction to any person, firm or corporation that performs residential construction and that is required to be licensed as a contractor pursuant to this part and fails to have a valid license when acting as a contractor." Thus, an unlicensed contractor who performs work on single-family residential construction forfeits his lien rights. The provision does not include any types of construction other than single-family residential. In interpreting statutes, we must presume that the General Assembly had knowledge of prior enactments and judicial constructions thereof. *State v. L.W.*, 350 S.W.3d 911, 918 (Tenn. 2011). The General Assembly has the authority to change the common law, and the intent to do so can be established by a statute covering the specific area addressed by the common law. *See Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 751 (Tenn. 2001); *Jordan v. Baptist*

---

[3]The bank cites *Kyle v. Williams*, 98 S.W.3d 661, 662 (Tenn. 2003), a case in which the Supreme Court concluded that the contractor, who possessed a license when the contract was formed but did not maintain the contract throughout the time when services were performed under the contract, was an unlicensed contractor for purposes of Tenn. Code Ann. § 62-6-103(b). We find the facts of *Kyle* distinguishable from the present facts in that the contractor in *Kyle* did not possess a contractor's license during part of the relevant time period. Moreover, it is significant to note that *Kyle* was an action brought by the contractor against the property owner.

[4]The court went on to conclude that the contractor could recover on a claim for the debt. *Dotson*, 736 S.W.2d at 120.

*Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999). In construing statutes, we presume that the General Assembly did not intend to enact a useless statute. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010).

In light of the statement in *Dotson* that an unlicensed contractor had no lien rights, the enactment of what is now Tenn. Code Ann. § 62-6-128 appears to be intended to limit the rule to single-family residential property. Otherwise, the enactment would have been unnecessary. There is no other statutory provision abolishing lien rights for unlicensed contractors in other contexts. It is a rule of statutory construction that the mention of one subject in a statute means the exclusion of subjects not mentioned. *Bryant v. Baptist Health Sys. Home Care of E. Tenn.*, 213 S.W.3d 743, 749 (Tenn. 2006).

Given the language of Tenn. Code Ann. § 62-6-128 and the state of the law at the time of its enactment, we conclude that, outside the context of single-family residential construction, the fact that a contractor is unlicensed does not result in forfeiture of the contractor's lien. Therefore, the trial court erred in finding that Anchor had forfeited its lien in this case.

3.

The third issue we must address is whether the trial court erred in finding that Anchor agreed to subordinate its lien to the bank's lien rights.

The trial court based its conclusion on an e-mail sent by Bronze to Thigpen on January 30, 2007, and Thigpen's response. The relevant e-mail from Bronze included the following statements:

> I am working on the bank loan and its closing. I am checking on the ability to start clearing and grading prior to closing construction loan. Will you sign a release to the bank if you start prior to the loan closing. That means the banks [sic] needs first place in the title position rather than you because you started before the loan closed.

In his e-mail response, Thigpen stated that he would sign a release. The trial court concluded that, "Reasonable minds could not differ the January 20, 2007 e-mail between Contractor and Developer represents an agreement by Contractor to subordinate its lien to Bank." We cannot agree with this conclusion.

An agreement by Anchor to subordinate its lien to the bank's lien rights must satisfy the elements of a valid contract: "[A]n enforceable contract must result from a meeting of

the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced." *Jones v. Lemoyne-Owen Coll.*, 308 S.W.3d 894, 904 (Tenn. Ct. App. 2009) (quoting *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 635 (Tenn. Ct. App. 2002). An agreement to agree to something in the future is not generally enforceable. *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005). In the present case, the e-mails indicate that Thigpen was willing to sign a release in the future. The source of the financing for the project had not yet been finalized at the time of this email exchange. It is not clear from this exchange whether Anchor would receive financial compensation for such a release. While Thigpen's response reflects a willingness to negotiate some future agreement, we do not consider these emails sufficient to establish mutual assent to definite terms.[5]

Based upon our conclusions regarding the first three issues, the trial court erred in granting summary judgment in favor of the bank.

4.

The final issue for our consideration is whether the trial court erred in failing to grant Anchor's motion for partial summary judgment that its lien had priority over the bank's deed of trust.

### Bank's 2007 deed of trust

As outlined above, the bank recorded two deeds of trust, one on June 24, 2007 and another on November 12, 2008. For purposes of determining the priority of the competing liens, we must decide whether the bank perfected its lien by the filing of the initial deed of trust in June 2007. At that time, the property in question was owned by SBD. Yet, the bank's deed of trust lists SB Holdings as the grantor of the deed of trust. Anchor asserts that, as a result of this defect, the 2007 deed of trust was void. We agree.

A deed of trust is "a conveyance of an interest in real property to secure a debt." *Levine v. March*, 266 S.W.3d 426, 438 (Tenn. Ct. App. 2007). It stands to reason that a person or entity cannot effectively convey an interest it does not possess. Pursuant to Tenn. Code Ann. § 66-4-201, part of the champerty statutes, "[n]o person shall agree to buy, or to

---

[5]Given our conclusion that there was no enforceable agreement to subordinate Anchor's lien, we need not determine the effect of Tenn. Code Ann. § 66-11-124(b), which provides that "[a]ny contract provision that purports to waive any right of lien under this chapter is void and unenforceable as against the public policy of this state."

bargain or sell any pretended right or title in lands or tenements, or any interest in such pretended right or title." A deed of trust may be champertous when the grantor has no legal interest in the property to be conveyed. *Levine*, 266 S.W.3d at 438.

The bank cites the case of *Wilkins v. Reed*, 300 S.W. 588 (Tenn. 1927), to support its position that the defect in the deed of trust should not deprive it of its lien priority because its 2007 deed of trust was registered and gave notice of the bank's financial interest in the property. We find *Wilkins* to be distinguishable because it involved a defect in the registration of the deed of trust. *Id.* at 589. In the present case, the deed of trust itself is defective in that it fails to convey an interest in property; the registration of such an instrument cannot result in a perfected security interest. *See In re May*, 310 B.R. 405, 417-19 (E.D. Ark. 2004); *In re Moreno*, 293 B.R. 777, 782-83 (D. Colo. 2003). We likewise reject the bank's assertion that it is entitled to relief based upon equitable principles.[6]

The bank argues that the 2007 deed of trust was effective because (a) SB Holdings is the parent company of SBD, its wholly owned subsidiary, and was acting as its agent or (b) the two companies were engaged in a joint venture. There is a presumption that parent and subsidiary corporations are separate and distinct legal entities. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 651 (Tenn. 2009). The parent's actions may be attributed to the subsidiary only when one company acts as the agent for the other or the two companies are alter egos. *Id.* at 652. The 2007 deed of trust was signed by Jeff Sweeney, President, on behalf of SB Holdings, and there is no reference to SBD. If SB Holdings were acting as SBD's agent, Sweeney could have signed the deed of trust for SBD, but there is nothing in the record to suggest that SB Holdings acted on behalf of SBD in executing the deed of trust. When an agent fails to reveal his status, he is bound as principal. *Anderson v. Durbin*, 740 S.W.2d 417, 418 (Tenn. Ct. App. 1987).

The bank relies on evidence that SB Holdings and SBD were both involved in the development and sale of the property. To establish a joint venture requires evidence of common interest and purpose and equal right of control. *Fain v. O'Connell*, 909 S.W.2d 790, 793 (Tenn. 1995). Each party to a joint venture "shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure." *Id.* (quoting *Spencer*

---

[6]In declining to provide equitable relief to a bank relying upon a deed of trust from an entity that did not own the property, the court in *In re May* stated: "No entities are better situated to properly perfect interest in land than banks, whose purposes are to maximize profit derived from lending money and to ensure the repayment of their loans by taking an interest in the borrower's collateral. Courts can not underwrite Defendants' business risks under the guise of equity when Defendants themselves failed to take minimal steps to ensure their interests were properly protected." *In re May*, 310 B.R. at 419.

*Kellogg & Sons, Inc. v. Lobban*, 315 S.W.2d 514, 520 (Tenn. 1958)). We find no such evidence in the record. Moreover, as discussed above, the purported agency relationship does not appear on the deed of trust.

Priority of bank and Anchor liens

Having determined that the bank's 2007 deed of trust did not perfect its security interest, we must analyze the priority of the bank's deed of trust recorded on November 12, 2008 and Anchor's mechanic's liens recorded in July 2008.

With respect to the attachment of mechanics' and materialmens' liens, Tenn. Code Ann. § 66-11-104(a) provides:

> The lien provided by this chapter shall attach and take effect from the time of the visible commencement of operations, excluding however, demolition, surveying, excavating, clearing, filling or grading, placement of sewer or drainage lines, or other underground utility lines or work preparatory therefor, erection of temporary security fencing and the delivery of materials therefor.

Thus, the issue for determination here is whether the date of visible commencement of operations occurred prior to the bank's recording of its lien in November 2008. Anchor points to several categories of construction it performed prior to November 2008 as constituting visible commencement of operations sufficient to attach its lien.

It is undisputed that, prior to the bank's recording of its lien in November 2008, Anchor erected the following: 10 to 12 above-ground concrete retaining walls, an above-ground outlet control structure, fire hydrants, and around 30 above-ground catch basins. All of these structures are permanent and remain on the property. The retaining walls are concrete structures that rise out of the ground about two feet; they provide support for the drainage system. The outlet control structure, which is five feet square and approximately eight feet tall , regulates the discharge of storm water in the development. The concrete catch basins capture stormwater runoff; the vertical leg of these L-shaped structures rises out of the ground about one foot from the street grade.

The parties are in agreement that these structures are related to the property's drainage and utility system. The parties hold conflicting views, however, as to the legal effect of the fact that these structures are part of the drainage system.

This is an issue of statutory construction, a question of law. *Seals v. H & F, Inc.*, 301 S.W.3d 237, 242 (Tenn. 2010). In statutory interpretation, we "must give effect to every

-10-

word, phrase, clause and sentence." *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 862 (Tenn. 2010) (quoting *Cohen v. Cohen*, 937 S.W.2d 823, 828 (Tenn. 1996)). Moreover, "an exception generally delineates the extent of the general provision." *Ky.-Tenn. Clay Co. v. Huddleston*, 922 S.W.2d 539, 543 (Tenn. Ct. App. 1995). Tennessee Code Annotated § 66-11-104(a), quoted in its entirety above, excludes "demolition, surveying, excavating, clearing, filling or grading, *placement of sewer or drainage lines, or other underground utility lines or work preparatory therefor*, erection of temporary security fencing and the delivery of materials therefor."[7] (Emphasis added). The bank argues this provision "specifically excludes work related to installation of drainage lines and the delivery of materials for that activity." Anchor asserts that the statutory exception does not broadly exclude all structures related to the drainage system.

The phrase "or other underground utility lines or work preparatory therefor" modifies the phrase that precedes it: "placement of sewer or drainage lines." The use of the words "other underground" to describe the excluded utility work suggests that the statutory exclusion applies only to underground utility lines, not to structures above ground. Moreover, the exclusion applies to "utility *lines"* and to "sewer or drainage *lines*," not to all aspects of a sewer or drainage system. Giving meaning to every word and phrase employed by the legislature, we must conclude that the utility exclusion does not encompass the above-ground structures erected by Anchor as part of the overall drainage system.

We, therefore, conclude that Anchor's construction of the above ground concrete structures was sufficient to attach its lien. Because these structures were built prior to the November 2008 registration of the bank's deed of trust, we conclude that Anchor's lien should take priority over the bank's lien. The trial court erred in failing to grant summary judgment in favor on Anchor on this issue.

---

[7]These exclusions were specifically incorporated into the statutory definition of "visible commencement of operations" by a 2007 amendment to Tenn. Code Ann. § 66-11-101(16) that took effect in May 2007. Because some of the relevant work may have occurred prior to that date, we rely solely on the language in Tenn. Code Ann. § 66-11-104(a).

CONCLUSION

The decision of the trial court is reversed and we remand with instructions to grant summary judgment in favor of Anchor Pipe on the issue of lien priority. Costs of appeal are assessed against the appellee, Trust One Bank.

_____
ANDY D. BENNETT, JUDGE