FILED
06/12/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 19, 2018 Session

## CLAYTON PICKENS v. JOHN R. UNDERWOOD, ET AL.

Appeal from the Circuit Court for Blount County
No. L-17937    David Reed Duggan, Judge

_____

No. E2017-02120-COA-R3-CV

_____

This appeal arises from a dispute over a construction contract between Clayton Pickens ("Pickens"), a general contractor, and John R. Underwood ("Underwood") and his wife Suzanne Curtin ("the Underwoods," collectively).[1] Pickens sued Underwood initially in Chancery Court but later transferred to the Circuit Court for Blount County ("the Trial Court") for allegedly failing to pay him under a contract to build the Underwoods' home. Underwood filed counterclaims against Pickens alleging, among other things, fraud, cost overruns, violation of the Tennessee Consumer Protection Act, and entering into a construction contract in excess of the monetary limit on Pickens' contractor's license. This case was tried before a jury. The jury found the Underwoods breached the construction contract and awarded Pickens $147,340.25. The jury also found that Pickens breached the contract through certain errors in construction and awarded the Underwoods $10,740.00. The Trial Court entered its final judgment affirming the jury's verdict and awards of damages. The Underwoods appeal, arguing in part that Pickens should have been limited to his actual documented expenses because he entered the construction contract in excess of his contractor's license limit. We hold, *inter alia*, that under the law in effect at the time of the execution of the contract, Pickens was not limited in damages to his actual documented expenses. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

---

[1] Appellants' brief refers to the parties collectively as the Underwoods despite their different surnames. For convenience, we too will refer to Appellants collectively as the Underwoods.

James S. MacDonald, Knoxville, Tennessee, for the appellants, John R. Underwood and Suzanne Curtin.

J. William Coley and Bart C. Williams, Knoxville, Tennessee, for the appellees, Clayton Pickens and Jama Pickens.

Brad A. Fraser and J. Matt Drake, Knoxville, Tennessee, for the appellees, Danny Miller, individually and d/b/a Miller's Appliances Sales and Service/HVAC, Inc. a/k/a Miller's Heating & Air, Inc.

## OPINION

## Background

The Underwoods entered into a $572,000 contract with Clayton Pickens on June 2, 2008 for the construction of a home on 25 acres of land. Pickens subcontracted Miller's Heating & Air, Inc. to install the HVAC system. On May 9, 2009, the final bill which totaled $679,314.94 was presented by Pickens to Underwood. The construction contract provided that "[i]f proposed construction or under construction, it is understood that any additions or changes not included in the plans and specifications are to be agreed upon between the contracting parties and are to be confirmed in writing as the work progresses." Underwood objected to Pickens' figure and declined to pay him the amount he claimed was owed. On July 21, 2009, Pickens sued Underwood in Blount County Chancery Court, alleging breach of contract, unjust enrichment, promissory fraud and mechanics' and materialmens' lien. Underwood, meanwhile, learned that the monetary limit of Pickens' contractors' license at the time he signed the contract was $350,000.

Underwood filed an answer and counterclaim seeking a jury trial. A hearing was conducted by a Special Master in the case in February 2012. Counsel for Pickens stipulated at that stage that Pickens was an unlicensed contractor limited in damages to actual documented expenses. This case then was transferred to the Trial Court. In November 2012, Pickens filed several third party complaints against certain sub-contractors. Pickens sued Suzanne Curtin in a separate complaint. All of these various cases were consolidated for trial.

In April 2014, the Trial Court entered an order, contrary to counsel for Pickens' earlier stipulation, in which it determined Clayton Pickens was a licensed contractor, stating in part: "Clayton Pickens is hereby determined to be a licensed contractor for purposes of the Tennessee Contractor's Licensing Act of 1994 Tenn. Code Ann. §62-6-101, *et seq*. during the time period in question in this lawsuit even though the monetary

limit of his license may have been less than the sum of the contract to construct the house of John R. Underwood." In May 2017, this case was tried before a jury.

Several evidentiary rulings made by the Trial Court gave rise to a number of the issues the Underwoods raise on appeal. First, upon Miller's motion the Trial Court barred Gary Cobble ("Cobble"), an architect, from testifying for the Underwoods regarding alleged defects in the HVAC system. Cobble, articulating the basis of his views, stated in his deposition, in part:

> Q. What was the reason for having Chancey & Reynolds [HVAC technicians] come out to the property?
> A. Earlier I testified that when you have humidity problems inside a home or a building, it oftentimes is because — I don't want to say oftentimes — sometimes it's because the units are too large and they don't run long enough to pull all the moisture out of the building. Well, that's why I met Steve initially, Steve Chancey, so he could run the Manual J load letter on the home. The two pieces of equipment are sized properly, according to the Manual J letter. So the next step is, is the equipment installed correctly and cycling correctly, coming on and off correctly. And Ronnie Brock did those tests on February 1, and they are. So by process of elimination, we concluded that something in the zoning, in the configuration of the duct work was just off, somehow wrong, or just not functioning properly. So rather than redesigning the duct work, tearing it all out and trying to reconfigure it, the easiest solution to the problem was to add dehumidifiers, which ultimately was done.
> Q. Is it fair to say that you relied on Chancey & Reynolds' expertise in HVAC systems to form the basis of your opinions, then?
> A. Yes.
> Q. You're saying you're not a licensed HVAC repairman.
> A. No.
> Q. You're not certified.
> A. No. That's why I had to go to Chancey & Reynolds and hire them to do this work.
> Q. Have you provided opinions in prior cases on HVAC issues?
> A. Yes.
> Q. Can you tell me which cases, or is that something you'd have to look at records?
> A. Off the top of my head, I can't think of any, but oftentimes I have to look at the HVAC system, not very often, but along that line, humidity control, I've been involved with a lack of humidity control, I've been involved with many times over my career.

Q. And I'd like to narrow that down to lack of humidity control that, according to you, is caused by the HVAC system, or more specifically, the zoning. Have you dealt with that in prior cases or have you testified in prior cases concerning lack of humidity control by the HVAC system?

A. Lack of humidity control, yes. Zoning, no. And I can't think of any specific cases. There hasn't been many times, but I'm just very familiar, with the line of work I do and being in construction for so many years, I've seen what lack of humidity control can do . . . .

***

Q. Now, he does mention here that there's no bypass damper on the zoning unit, and the owner may want to add one. Is that right?

A. It does say that. I don't recall that, but it does say that, no bypass damper.

Q. But he also mentions that wasn't creating any problems, correct?

A. That is correct.

Q. So is it fair to say, based on your testimony and based on this invoice that I have here, that the system was appropriate, the selection of the system was appropriate, and the only issue was the zoning of the central area of the house, correct?

A. That's what it boiled down to. And by process of elimination, that's where we landed.

Q. What is your understanding of the zoning of the central area of the house?

A. That somehow the zoning or lack of zoning or improper design of the duct work and zoning was not allowing the units to pull the humidity out of the central part of the house.

Q. You're talking to somebody that doesn't do HVAC work, and I don't think anyone else in here does, but tell me what zoning is.

A. In simple terms, a small, one-level house has one air-conditioning unit and one thermostat. It has one zone. If you put a second story on that house and put a separate air-conditioning system for the upstairs, you've got two zones. So every thermostat controls a zone. This house has three thermostats with two units. In my example that I gave you, you've got two systems with one thermostat each and two zones. This one is more complicated because you've got three thermostats and only two units, so it's split. It's got dampers in it to divert the conditioned air into different spaces. So that's where we finally concluded there's some kind of problem in the zoning, the way the thermostats and the configuration of the duct work was made up, and dampers. But the easiest way to solve the problem

-4-

was just to add dehumidification, because that's really all we were after, anyway. We didn't have issues with rooms being cold in the winter, rooms being hot in the summer, that sort of thing. It was just we needed humidity control in the central part of the house.

Q. You said a couple of times that "we" reached that conclusion, so was it also Steve Chancey and Ronnie Brock's opinion that the central portion of the house was not zoned properly?

A. Well, I don't think Ronnie Brock so much, because he's a technical guy. Steve and I spoke about it later, and I don't want to put words into Steve's mouth, either, but ultimately, with talking with Steve and Ronnie, that was my decision or my analysis of the problem, that there's something going on with the zoning, because that's all that was left of the whole system. We knew the thermostats were working properly. They were sized properly. The equipment's operating properly except for a couple of little small items that Ronnie notes. That's all that's left to create the lack of humidity control.

Q. And that's basically just by process of elimination you got to that.

A. Exactly, by process of elimination, we got to that conclusion.

Chancey and Brock submitted affidavits stating that they had not rendered the opinions attributed to them. The Trial Court excluded Cobble's testimony as to the HVAC system.

In addition, the Trial Court overruled the Underwoods' motion in limine seeking to bar the testimony of appraiser Fred Metz ("Metz"). Metz testified regarding the quality of the construction and whether any alleged defects resulted in a diminution of value. The Underwoods contend that this testimony was irrelevant and prejudicial. Metz, opining on numerous aspects of the house, testified in part as follows:

Q. And, okay. Mr. Metz, in addition, did you, did you inspect an area in the master shower?

A. I did.

Q. What was your understanding of the complaint?

A. The complaint was that the water did not drain out of the master shower properly.

Q. And did you inspect that condition?

A. I did.

Q. What did you do to inspect it?

A. I turned on the shower. I turned on the shower and let it run for several minutes, enough to notice that the water gradually drained out of the central

drain, and it appeared it drained out, so I found that the complaint was unfounded.

Q. All right. Now, do you have an opinion as to whether or not the condition as you saw it in the master bath shower caused any diminution in the fair market value of the structure of that home as you saw it on June 22, 2016?

A. In my opinion, I found the complaint to be unfounded and there was no negative effect on the market value.

Q. So no diminution in value?

A. That's correct.

Q. Now, going back to the cupped hardwood floor complaint. Based on your examination during your appraisal on June 22, 2016, do you have an opinion whether the floors in their actual condition as you saw them have any negative effect or diminution in value of the structure of that home?

A. In my opinion the day I saw the floors, they were not cupped. I found the complaint to be unfounded and there was no negative effect on value. No diminution in value.

Q. Okay. Now, I want to ask you also then about the HVAC system. Now, Mr. Metz, in all due respect, you didn't perform any testing on this HVAC system, did you?

A. I did not.

Q. Did you look at the system?

A. I did.

Q. Did it appear to be a functional system?

A. Yes, it did.

Q. Did you look at the ductwork underneath the house for the system?

A. I did.

Q. How did it appear to you?

A. It appeared to be well-installed.

Q. Okay. Did you experience the interior of the home?

A. I did.

Q. Did you feel that the temperature was appropriate?

A. It was, yes.

Q. All right. Did you happen to check to see what the settings were that day?

A. I did not.

Q. All right. Did you notice any humidity in the house on June 22, 2016?

A. It was a hot day outside but there was no humidity that I determined in the house.

Q. Now, with respect to the basement, did you go into the basement area?

A. I did.

Q. Did you detect what you considered to be excessive humidity in the, not the basement, but the crawl space?

A. No, I did not find any humidity there either.

Q. All right. Now, do you have an opinion, with respect to the observation you performed, whether or not the HVAC system as you saw it and observed it caused any negative effect on the fair market value of that home or any diminution in value as you saw it on June 22, 2016?

A. I found the HVAC system to be completely working fine and, in my opinion, there was no negative effect. No diminution in value.

Q. I want to call your attention to the front porch. Let me -- before I do that -- did you -- looking again at these cabinets, did you have an opportunity to open and close the doors on the cabinetry?

A. I did.

Q. Did you have an opportunity to inspect closely the alignment of the doors?

A. I did.

Q. Did you find that there was any warping of the doors?

A. I did not see any warping of the doors.

Q. Was there any difficulty in the operation?

A. None at all.

The Trial Court also overruled the Underwoods' motion in limine to exclude from evidence a letter from Underwood to Pickens stating "Enclosed you will find a check for $65,327.84 as payment in full to you for our house constructed at . . ." as well as the Underwoods' check register. According to the Underwoods, this letter constituted an offer to settle. The Trial Court found otherwise.

Following trial, the jury reached its verdict. Pickens was awarded $147,340.25 against the Underwoods for payment under the contract. The Underwoods, for their part, were awarded $10,740 against Pickens for construction defects pertaining to the driveway and to insulation. Motions for a new trial were filed and overruled by order of the Trial Court. The Trial Court, in its oral ruling incorporated into its order on the Underwoods' motion for a new trial, discussed in detail as follows:

In the motion as amended the defendants have suggested that the court erred in granting a motion in limine concerning the monetary limits of Mr. Pickens's license. As I've said before, and including once again this morning, if I'm wrong about this we're going to have to retry this case. And I guess I could be wrong in one of two respects. There's the issue of

-7-

was he a licensed contractor that Anchor Pipe dealt with.[2]   There's also, I suppose, a second issue about what law applies at a given point in time.  Do I apply the law at the time of the contract or do I apply the law at the time of the filing of the suit.  Because the law changed in the interim.[3]   So Mr. MacDonald has suggested that I've erred on those two grounds.

The Court of Appeals may see this differently.  And if they do I'm sure they will explain to me why.  But I think I have applied the Anchor Pipe law correctly.  And I think that it is the law that applies in this case.  And I'm doing the best I can to apply that law.

Now, as far as the fact that that law was amended by the legislature and that Anchor Pipe was arguably legislatively overruled; that's true, that the law was changed by the time of the filing of the suit but I believe that the law as it existed at the time of the contract is the law that I have to apply.  I think Mr. Pickens's rights and the relief that he can seek are going to be measured by what the law was at the time he entered into his contract, not at the time that he sought a remedy.

Now, as you all have noted, I've addressed this matter several times already including but not limited to Jama Pickens's first motion to dismiss and/or for summary judgment and Clayton Pickens's motion to dismiss counterclaims.  I've also addressed it in a motion to reconsider and for interlocutory appeal.

Now, Mr. MacDonald has correctly pointed out, as I've already said this morning, that the statute which Anchor Pipe interpreted was amended before the filing of the complaint.  And the Anchor Pipe court specifically noted that it was deciding its case under the old law.  But, again, the Court believes Mr. Pickens, as a plaintiff, is entitled to make a claim based on his rights as they existed at the time of his contract.  And at the time of the contract only an unlicensed contractor was limited to documented expenses.  And under Anchor Pipe a contractor did not cease to be a licensed contractor just because the contractor exceeded the monetary amount of his

---

[2] *Anchor Pipe Company, Inc. v. Sweeney-Bronze Development, LLC et al.*, No. M2011-02248-COA-R3-CV, 2012 WL 3144638 (Tenn. Ct. App. Aug. 2, 2012), *no appl. perm. appeal filed*, a case standing for the proposition that, under then-existing law, a licensed contractor who contracts above his or her monetary limit still is considered licensed.

[3] Tenn. Code Ann. § 62-6-103(b) provided in June 2008 when the construction contract was signed: "Any unlicensed contractor covered by the provisions of this chapter shall be permitted in a court of equity to recover actual documented expenses only upon a showing of clear and convincing proof."  Effective June 23, 2009, the statute was amended to read: "Any contractor required to be licensed under this part who is in violation of this part or the rules and regulations promulgated by the board shall not be permitted to recover any damages in any court other than actual documented expenses that can be shown by clear and convincing proof."  The instant lawsuit was filed July 21, 2009 following this amendment, hence the question over which version applies and to what effect.

-8-

license. That case was decided under the old law prior to the 2009 amendment, as the Anchor Pipe case itself noted in a footnote. But that same law was still in effect when this contract was entered into and I believe that law governs Mr. Pickens's rights. And, therefore, because he was a licensed contractor, regardless of the monetary limits of his license, and also because the limits of his license were irrelevant given that financial security was not an issue in any claim in this case - there were no materialman's liens or supplier's liens or laborer's liens - I think that the limits of his license were irrelevant. So the motion as amended in that respect is denied.

The defendants have alleged in their motion as amended that the Court erred in denying the defendants's motion in limine to exclude the June 3, 2009 letter from Mr. Underwood to Mr. Pickens enclosing a check in what was proposed to be a final payment. The defendants have alleged that that was a settlement offer and should have been excluded but the Court does not agree with that. It was not a settlement offer. It was perhaps the final step in brewing the dispute that led to the lawsuit but Mr. Underwood was simply in that letter stating his position as to the final amount due and owing under the contract. That's how I see that letter. So the motion as amended is denied in that respect.

Next, the defendants have alleged in their motion as amended that the Court erred in denying the defendants's motion in limine to exclude the testimony of appraiser Fred Metz pertaining to diminution in value. The Court does not agree with that. As the Court instructed the jury, and as was a potential measure of damages for the jury, depending upon their factual findings Tennessee law provides that if the cost of repairs is disproportionate when compared with the difference in value of the structure actually constructed and the one contracted for, the diminution value may be used instead as an alternative measure of damages. Mr. Metz's testimony was relevant on that issue. And it seems to me that the jury obviously didn't decide the case on that basis anyway. The motion as amended is denied in that respect.

Next, the defendants have alleged in the motion as amended that the Court erred in excluding Mr. Pickens's statement that he was fully licensed. To me that's just another attempt to raise the financial limits of his license which the Court has already addressed and the Court incorporates its ruling on that issue. But under Anchor Pipe, which was in effect at the time of the contract, Mr. Pickens was a licensed contractor and the financial limits of his license were irrelevant. Again, assuming and given that there were no issues about financial security. So the motion is denied in that respect.

***

Next, in the motion as amended the defendants have suggested that the Court erred in granting the motion in limine excluding Gary Cobble's testimony concerning the heating, ventilation and air-conditioning system. The Court disagrees.

It was clear from Mr. Cobble's deposition testimony that he could not say and did not have an opinion about what was wrong with the HVAC system. And that he had no basis for any opinion that was straightforward and supported by a rational explanation which reasonable persons could accept as more correct than not. His opinion would not have substantially assisted the jury to understand the evidence or to determine a fact in issue. Nor were the facts that underlay his opinion indicative of trustworthiness.

In essence he said this -- and we've been through this numerous times. He said there's nothing wrong with this component of the HVAC system and there's nothing wrong with that component of the HVAC system; therefore, by process of elimination, there must be something wrong with the remaining component of the HVAC system. That was his testimony.

And when he was asked, "Well, what's wrong with that remaining process of elimination system?" He said, "I don't know." I can't let a jury hear such evidence as that.

He also claimed to be relying on certain statements of Chancey & Reynolds but the plaintiff filed affidavits from those Chancey & Reynolds affiants saying that they had said no such thing to Mr. Cobble.

With respect to the HVAC system Mr. Cobble's testimony was rank speculation. And I think I feel probably stronger on this issue than I do on any of the others. To have admitted that testimony would have been to make a mockery - a mockery - of Rule 702 and 703 of the Rules of Evidence. So the motion as amended is denied in that respect.

Next, the defendants suggest that the Court erred in failing to strike those affidavits from those Chancey & Reynolds affiants. As the Court said at the time, the Court understood why the defendants might not have been happy with the testimony of someone their expert had allegedly consulted with being used against them. But I'm not aware of any law or rule of evidence and none was cited by the defendants other than in this motion for a new trial, Rule 26, providing that someone's statement that another expert isn't telling the truth should be precluded just because the person who's saying the other expert lied were consulted by that expert. I'm not aware of any such rule.

-10-

The Court further believes that Miller's Heating & Air has made several good points in their response - that the defendants never identified these affiants as experts. Nothing before the Court suggests that these defendants ever consulted with these affiants. Mr. Cobble, apparently, contacted them. The affiants, apparently, were not experts consulted by the defendants or their attorney whose testimony they then decided not to use. That didn't apply here.

If it was work-product, if that's what the argument is, I'm not sure -- as has been questioned by the other parties here, I'm not sure that an expert can invoke a work-product privilege by consulting with someone else. But if he can, it would seem to me that that privilege was waived when Mr. Cobble disclosed their identities and alleged opinions in his deposition and in his report. But, most importantly, what we always want more than anything else is the truth. And then to let the jury take that truth and make a decision. And the Court is persuaded that Mr. Cobble was not telling the truth with respect to these Chancey & Reynolds representatives and what they allegedly told him. And all with respect to an opinion for which he had no legitimate basis. So the motion in that respect is denied.

***

Next, in the motion as amended it's been suggested that the Court erred in sustaining objections to the testimony of Gary Cobble concerning whether the humidity level in the plaintiffs's home was workmanlike.

Now, I don't mean to beat a dead horse but that's been stated so many times I just want to reiterate. Mr. Drake has addressed this. Humidity cannot be workmanlike or unworkmanlike, it just is. It is or it is not. Humidity exists or it doesn't exist. And it's at the -- well, it's always going to exist, I suppose. And it may be high, it may be low, it may be higher than it should be inside a house or it may be fine. But humidity in and of itself is not workmanlike or unworkmanlike, it just is.

Now, I know what you mean but, nevertheless, you keep saying that. And that's not the proper way to phrase the issue, to frame the issue. The issue is - was something unworkmanlike done that caused the humidity to be at an excessive level in the house.

I also want to say that to the extent it's been suggested, and it's been said in writing, that I prevented Mr. Cobble from giving testimony about humidity and that is a rank misrepresentation. That's not true. We had elaborate testimony from Mr. Cobble about humidity.

Now, I did not go back and review the transcript in its entirety. For one thing, I don't have the transcript in its entirety. I've read the portions

-11-

that have been attached to the motions and responses. But I did go back and look at my notes. And I've marked where Mr. Cobble started talking about humidity.

Now, I can't tell you how long it went on in terms of a period or for how many pages of the transcript because these are just my notes. But Mr. Cobble talked extensively about humidity.

He talked about the hardwood flooring. He said he visited the home on January 13, 2011 and again in July of 2011. He said the floors had cupped. That sometimes it occurs in summer but it should not have happened in the winter. He said what caused that excessive cupping was humidity.

We had collective Exhibit 71 which were several photos showing the gap that he felt like was inappropriate between the wall and where the boards began. He said it exceeded the recommended amount.

He talked about other humidity problems with photographs put into evidence of cabinets and cabinet doors and closet doors swollen and not shutting. He talked about and there were pictures of doors overlapping.

He talked about on July 26, 2011 he used a humidistat and determined that the temperature inside the home was 73.6 degrees and that the humidity was 66%. And he said an appropriate humidity in the summer at that point in time would have been 50%.

He talked again about cupping of the floors.

He talked about doors now striking each other. And some doors wouldn't close.

He talked about how the dehumidifiers had been installed and that now the humidity was under control. And he talked about there being a 72 degree temperature inside the home now and 50% humidity. And that the doors were now working. And that the summer cupping was now normal.

So he talked extensively, testified extensively about humidity. Now, what he could not say, by his own testimony and admission, was whether the floors were installed in a workmanlike manner. It's the Court's recollection that he testified at least once, and I think perhaps twice, that he could not say whether or not the installation of the flooring was workmanlike.

He also said that the problem with the flooring could have been caused by either three or four things. I still think there were four things that he identified. I may be wrong about that but I think he said there were four things that could have caused those boards to cup. I only found three of those in my notes. He said the materials could have been stored prior to being sent to the site or shipped improperly. It could have had to do with the ways in which the materials were stored or shipped. He said it could

have been failure to allow the boards to acclimate once they got on-site. Or it could have been improper installation. And I still think there might have been a fourth thing he identified but there were, let's just say there were at least three.

He said it could have been any one of those. And he couldn't say which one caused the problem here. And it was only at that point, after the Court believes he realized what he had said and done and the impact of it -- now this is my conclusion but I believe this to be true -- that he then tried to change his testimony and say that he could say that the installation was unworkmanlike. And it was only then that the Court sustained the objection saying, no, I'm not going to allow him to say that; he's already told me he can't say.

So I think not only was the objection properly sustained but Mr. Cobble at that point had no credibility on the issue when he tried to change his testimony. So the motion as amended is denied in that respect.

(Footnotes added). The Underwoods appealed to this Court.

## Discussion

Although not stated exactly as such, the Underwoods raise the following issues on appeal: (1) whether the Trial Court erred in classifying Pickens as a licensed contractor and, therefore, not limiting his recovery to actual expenses proved by clear and convincing evidence; (2) whether the Trial Court erred in excluding the testimony of Cobble regarding problems with the HVAC system and humidity; (3) whether the Trial Court erred in denying the Underwoods' motion in limine to exclude the testimony of Metz; and (4) whether the Trial Court erred in denying the Underwoods' motion in limine and admitting into evidence the June 3, 2009 letter from Underwood to Pickens enclosing a $65,327.84 "final payment on house" check as well as Underwood's check register of June 3, 2009 in violation of Tenn. R. Evid. 408. Clayton and Jama Pickens raise their own issue on appeal of whether this appeal should be dismissed because the Underwoods failed to serve a copy of the notice of appeal and file proof of service with respect to unrepresented parties Thomas Pickens and Chris Finchum.

"A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness." *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). As to evidentiary issues, this Court "review[s] a trial court's decision to admit or exclude evidence, including a ruling following a motion in limine, under the abuse of discretion standard of review . . . ." *Allen v. Albea*, 476 S.W.3d 366, 377 (Tenn. Ct. App. 2015). As our Supreme Court has instructed:

-13-

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See McDaniel*, 955 S.W.2d at 263-64; *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Ballard*, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

*State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002)

We first address Pickens' issue of whether this appeal should be dismissed because the Underwoods failed to serve a copy of the notice of appeal and file proof of service with respect to unrepresented parties Thomas Pickens and Chris Finchum. No relief has been sought by or against these third-party defendants in this appeal, and it is unclear where their interests even are involved in this appeal. The Underwoods filed a motion with this Court on appeal for permission to file an amended and supplemental certificate of service along with a notice of appeal to these parties. We granted the Underwoods' motion to the extent that we accepted the amended and supplemental certificate of service attached to the motion.

Pickens cites Rule 3(e) of the Tennessee Rules of Appellate Procedure for the proposition that we may dismiss an appeal for failure to comply with the rules. In this case, Rule 5(a) concerning serving each party with a copy of the notice of appeal is implicated. Pickens fails to identify exactly how these third-party defendants would be injured should we decide this appeal. The issues on appeal do not relate directly to these parties. These parties were served with the amended and supplemental certificate of service. We do not believe that the drastic option of dismissal is warranted under these circumstances.

Moving to the Underwoods' issues, we next address whether the Trial Court erred in classifying Clayton Pickens as a licensed contractor and, therefore, not limiting his recovery to his actual expenses proved by clear and convincing evidence. Tenn. Code Ann. § 62-6-103(b) was amended effective June 23, 2009. This amendment "clarified" that "any contractor" required to be licensed under that chapter in violation of either the chapter or attendant rules or regulations would be limited to actual documented expenses. The issue then is whether Pickens, in undertaking this project in excess of his contractor's license monetary limits, is limited to his actual documented expenses. If so, argue the

Underwoods, he already has been paid more than his actual documented expenses and his claim should be dismissed.

The Tennessee Constitution prohibits retrospective laws. Tenn. Const. Art. I, § 20. Specifically, this constitutional provision provides "[t]hat no retrospective law, or law impairing the obligations of contracts, shall be made." *Id*. Accordingly, our Supreme Court has held "[s]tatutes are presumed to operate prospectively unless the legislature clearly indicates otherwise." *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 368 (Tenn. 1998). Nevertheless, this rule has two exceptions for remedial or procedural statutes since these two types of statutes may be applied retrospectively. *Id*. A statute is procedural " 'if it defines the ... proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right.' " *Doe v. Sundquist*, 2 S.W.3d 919, 923 (Tenn. 1999) (quoting *Kuykendall v. Wheeler*, 890 S.W.2d 785, 787 (Tenn. 1994) (alteration in original)). A remedial statute is one that "provides the means by which a cause of action may be effectuated, wrongs addressed, and relief obtained." *Id*.

In *Anchor Pipe*, this Court applied the previous version of Tenn. Code Ann. § 62-6-103, the one in effect when these parties signed the construction contract now before us, and concluded that a contractor's exceeding his or her monetary limit did not render him or her unlicensed. We stated in part:

> We disagree with the trial court's legal conclusion that Anchor should be considered unlicensed. We find instructive the Supreme Court's analysis in *Helton v. Angelopolous*, 629 S.W.2d 15, 16 (Tenn. 1982), a case in which the actual construction costs ended up exceeding the monetary limitations on the contractor's license. *Id*. at 17. The contractor sued the property owner for the unpaid balance on a building contract. In examining the applicable common law and statutory background, the Court noted the underlying public policy of protecting "the consuming public from unqualified builders." *Id*. The Court went on to distinguish between contractors who are "completely unlicensed" from those "who have complied with the licensing laws ... and may in some manner violate the provisions or limitations of their respective licenses." *Id*. at 18. As to the monetary limitations on contractors' licenses, the Court found their purpose to be "to afford financial security to owners, vendors and others dealing with a contractor." *Id*.

> There was no evidence that the contractor in *Helton* was guilty of any negligence in submitting his bid. *Id*. at 19. The Court observed, however, that there were other means (apart from precluding the contractor

-15-

from recovering on the contract) for addressing violations by licensed contractors:

> [I]f a licensed general contractor fraudulently, or in bad faith, or through collusion with an architect or engineer, submitted a bid upon a project obviously beyond the monetary limit on his license, ample sanctions, both civil and criminal, are available either through the courts or through the licensing agency. A rather complete statutory scheme exists for dealing with violations of licensed personnel, as contrasted with individuals or firms which, under prior law, undertook to operate in a regulated field without any attempt at compliance with the licensing requirements.

*Id*. Based on this reasoning, the Court reversed the decision of the lower courts dismissing the contractor's claim. *Id*.

While *Helton* was decided based largely on caselaw, we consider its distinction between unlicensed contractors and contractors bidding above the monetary amount of their license to be relevant here. The purpose of the monetary limit is to ensure the contractor's financial security and stability. *Id*. at 18. There is a regulatory scheme set up to address violations of the monetary limits by licensed contractors. *Id*.; *see* Tenn. Comp. R. & Regs. § 0680-01-.13,-.19. Furthermore, the case before us involves a dispute between a contractor and the bank that provided financing to the developer. It has generally been held that the rule restricting "an unlicensed contractor's access to court does not apply to disputes between contractors and other licensed professionals in the construction business." *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998); *see also Gene Taylor & Sons Plumbing Co., Inc. v. Corondolet Realty Trust*, 611 S.W.2d 572, 575-76 (Tenn. 1981); *Roberts v. Yarbrough*, No. 01-A-01-9802-CH-00096, 1999 WL 43252, at *2 (Tenn. Ct. App. Feb. 1, 1999). This rationale seems equally applicable here where the bank was in the business of approving construction loans and reviewing the credentials of contractors. The public policies underlying Tenn. Code Ann. § 62-6-103(b)—namely, protecting the safety and property of the public— are not implicated in a dispute between knowledgeable professionals.

We, therefore, conclude that Anchor was not an unlicensed contractor under Tenn. Code Ann. § 62-6-103(b).

*Anchor Pipe*, 2012 WL 3144638, at *3-4 (footnote omitted).

To recap, the contract in the instant case was signed on June 2, 2008. The statute was amended effective June 23, 2009. The complaint in this case was filed July 21, 2009, less than a month after the amendment took effect. We believe the date of the contract to be more significant here than the date of the filing of the complaint. By the time Pickens filed his complaint, all the operative, underlying events of this case had transpired. The amendment to Tenn. Code Ann. § 62-6-103 was substantive in nature. The effect of the amendment was to expand the limitation of actual documented expenses to any contractor required to be licensed under the statute and rules, whereas before this limitation applied only to unlicensed contractors. When Pickens signed the contract and performed the work for the Underwoods, he was not subject to that limitation as he was not unlicensed. *Id.* Pickens is not limited retroactively by the provisions of the amended statute.

While not necessarily dispositive, the Underwoods fail to explain how they were damaged by Pickens exceeding his monetary limit. The Underwoods' asserted damages arise from alleged cost overruns and defects. Pickens' financial security, the rationale of the statutory provision, played no role in this case. We do not condone contractors exceeding their monetary limits, nor indeed deviating from any law or rule governing their licensure and profession. We hold merely that, given the law *in effect at the time* of the contract in the instant case, Pickens was not limited to his actual documented expenses. We find no reversible error by the Trial Court as to this issue.

We next address whether the Trial Court erred in excluding the testimony of Cobble regarding problems with the HVAC system and humidity. "The trial court, therefore, must determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy." *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005). The Trial Court considered Cobble's testimony and clearly was unpersuaded as to its reliability. Chiefly the Trial Court was troubled by Cobble's inability to pinpoint exactly what was wrong with the HVAC system. The issue with Cobble's testimony was not a lack of credentials, but rather the speculative basis for his opinion and his lack of credibility as determined by the Trial Court. We find no reversible error in the Trial Court's decision to exclude Cobble's testimony regarding problems with the HVAC system.

We next address whether the Trial Court erred in denying the Underwoods' motion in limine to exclude the testimony of Metz. According to the Underwoods, Metz's testimony focused wrongly on questions of diminution of hypothetical market

-17-

value as opposed to what the Underwoods themselves wanted. Metz testified fairly glowingly as to how well-built the house was. The Underwoods assert that this was irrelevant to their specific complaints and, coming at the onset of trial, served only to prejudice the jury.

As pertinent to this issue, this Court discussed the measure of damages in *GSB Contractors, Inc. v. Hess*:

> "*Generally*, the measure of damages will be the cost or repair *unless* the repairs are not feasible or the cost is disproportionate to the dimunition in value." *Radant v. Earwood*, No. 02A01-9802-CV-00029, 1999 WL 418339, at *8, 1999 Tenn. App. LEXIS 390, at *20 (Tenn. Ct. App. June 22, 1999) (emphasis added); *see also Estate of Jessee v. White*, 633 S.W.2d 767, 769 (Tenn. Ct. App. 1982). When selecting the appropriate measure of damages applicable in this case, we are mindful of the following:
>
>> As a general rule, the measure of damages for defects and omissions in the performance of a construction contract is the reasonable cost of the required repairs. *Estate of Jessee v. White*, 633 S.W.2d 767 (Tenn. App. 1982). This is especially true when the structure involved is the owner's home. *Edenfield v. Woodlawn Manor, Inc.*, 62 Tenn. App. 280, 462 S.W.2d 237 (1970). However, in the event that the cost of repairs is disproportionate when compared with the difference in value of the structure actually constructed and the one contracted for, the diminution value may be used instead as the measure of damages. *Redbud Cooperative Corporation v. Clayton*, 700 S.W.2d 551 (Tenn. App. 1985) . . . .
>
> *Nutzell v. Godwin*, No. 33, 1989 Tenn. App. LEXIS 485, at *2-3 (Tenn. Ct. App. July 13, 1989) (emphasis added).

*GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 543 (Tenn. Ct. App. 2005).

We disagree with the Underwoods' contention that diminution in value was irrelevant. This was one possible measure of damages. Metz, an appraiser, was well-placed to testify on this topic. Contrary to the Underwoods' implicit argument that they could define subjectively any defects in the house, it was proper for the jury to hear evidence as to the objective condition of the home and what effect, if any, the alleged defects had on its value. This in turn relates to Pickens' case that he adhered to his contractual obligations and should be paid accordingly. We find no reversible error in

-18-

the Trial Court's denying the Underwoods' motion in limine to exclude the testimony of Metz.

The final issue we address is whether the Trial Court erred in denying the Underwoods' motion in limine and admitting into evidence the June 3, 2009 letter from Underwood to Pickens enclosing a $65,327.84 "final payment on house" check as well as Underwood's check register of June 3, 2009 which the Underwoods argue is a violation of Tenn. R. Evid. 408. Rule 408 provides:

> Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence actually obtained during discovery merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution; however, a party may not be impeached by a prior inconsistent statement made in compromise negotiations.

"Rule 408 is intended to encourage settlement of suits by forbidding a party from pointing to an opponent's settlement offer as proof that the opponent thought he would lose." *Goss v. Tommy Burney Homes, Inc.*, No. M2008-02376-COA-R3-CV, 2009 WL 2868765, at *9 (Tenn. Ct. App. Sept. 2, 2009), *no appl. perm. appeal filed*.

We agree with the Trial Court that the June 3, 2009 letter was not an offer to settle. Rather, this was a unilateral declaration of final payment by Underwood. Nothing in its own terms suggests the letter was meant to engage in negotiations to settle a lawsuit. Further, we do not see how the jury could mistake the letter as any sort of concession of being in the wrong and thus generating the kind of negative inference Rule 408 is designed to prevent. We find no reversible error in the Trial Court's denying the Underwoods' motion in limine to exclude the June 3, 2009 letter. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, John R. Underwood and Suzanne Curtin, and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE